**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SKILLZ PLATFORM INC.,

                           Plaintiff,

                    -against-

VOODOO SAS, *et al.*,

                        Defendants.
-----------------------------------------------------------------X

                       **REPORT AND**
                    **RECOMMENDATION**

                  **24-CV-4991 (VSB) (JW)**

**To the Honorable Vernon S. Broderick, United States District Judge:**

Plaintiff Skillz Platform Inc. ("Skillz") seeks a preliminary injunction prohibiting Defendants Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. (collectively, "Defendants") from making allegedly false representations in Defendants' advertising and from using bots in their gaming applications. Plaintiff also seeks expedited discovery to more fully discover the scope of Defendants' alleged use of bots and misconduct so that it can present such evidence during a preliminary injunction hearing. For reasons set forth below, Skillz has not established that it is imminently likely to suffer irreparable injury in the absence of preliminary relief. Further, because Plaintiff has failed to establish irreparable harm and the parties are well into discovery, Plaintiff's expedited discovery request is **DENIED**. Accordingly, the Court recommends that Plaintiff's motion for a preliminary injunction be **DENIED**.

## BACKGROUND

### A. Procedural history

On July 1, 2024, Plaintiff filed the initial complaint in this action against Defendants. Dkt. No. 1 ("Compl."). On August 22, 2024, Plaintiff filed its initial motion for a preliminary injunction and expedited discovery, along with supporting papers, including the declaration of Casey Chafkin (Dkt. No. 25 ["First Chafkin Decl."]). Dkt. Nos. 22–25. On September 20, 2024, Defendants filed their opposition with supporting papers. Dkt. Nos. 43–46.

On October 2, 2024, Plaintiff filed an amended complaint. Dkt. No. 49 ("Am. Compl."). On October 8, 2024, Plaintiff filed its notice of renewed motion for a preliminary injunction and expedited discovery.[1] Dkt. No. 50. In support of the motion, Plaintiff filed a memorandum of law (Dkt. No. 51 ["Pl. Mem."]), the declaration of Craig Carpenito (Dkt. No. 52 ["First Carpenito Decl."]), and the declaration of Casey Chafkin (Dkt. No. 53 ["Second Chafkin Decl."]).[2] On October 29,

---

[1] As part of its renewed preliminary injunction motion, Plaintiff withdrew its initial preliminary injunction motion filed at Dkt. No. 22.

[2] In the Second Chafkin Declaration at Dkt. No. 53, Mr. Chafkin asserted that "[o]ther than [his] change in title, the statements made in . . . [the First Chafkin Declaration at Dkt. No. 25] remain accurate." While Defendants object to the use of this declaration, the Court nonetheless relies on portions of the First Chafkin Declaration. Due to "the expedited and nonfinal nature of preliminary-injunction proceedings," courts can rely on "procedures that are less formal and evidence that is less complete than in a trial on the merits." Fed. Trade Comm'n v. Tapestry, Inc., No. 24 Civ. 3109 (JLR), 755 F.Supp.3d 386, 411 (S.D.N.Y. 2024) (citation omitted). And "[i]nsofar as a piece of evidence contains hearsay, or otherwise may lack indicia of reliability, the Court accounts for that fact in deciding how much weight to assign that piece of evidence." Id.

2024, Defendants filed their opposition (Dkt. No. 69), along with the declaration of Dmitri Williams (Dkt. No. 70 ["Williams Decl."]), the declaration of Harold K. Gordon (Dkt. No. 71 ["Gordon Decl."]), the declaration of George Edwards, Ph.D. (Dkt. No. 72 ["Edwards Decl."]) and objections to Plaintiff's evidence in support of its preliminary injunction motion (Dkt. No. 73). On November 12, 2024, Plaintiff filed a reply memorandum in further support of its motion (Dkt. No. 80), along with an additional declaration of Craig Carpenito (Dkt. No. 81 ["Second Carpenito Decl."]) and a response to Defendants' evidentiary objections (Dkt. No. 82). On November 19, 2024, Defendants requested leave to file a sur-reply, which the Court granted. Dkt. Nos. 83–84. On November 27, 2024, Defendants filed a sur-reply in further opposition to Plaintiff's motion for a preliminary injunction. Dkt. No. 85. The Court considers Plaintiff's motion for preliminary injunction fully briefed.

On April 22, 2025, Judge Broderick referred this case to the undersigned for General Pretrial and specific non-dispositive motions. Dkt. No. 88. On August 7, 2025, Judge Broderick issued an amended order referring Plaintiff's renewed motion for preliminary injunction to this Court for a report and recommendation. Dkt. No. 127.

On January 21, 2026, this Court held a hearing on Plaintiff's motion for a preliminary injunction.

3

B. **Factual background**[3]

Plaintiff operates a mobile gaming platform called Skillz, which was founded in October 2012 in Boston, Massachusetts. Am. Compl. ¶ 70. Skillz's gaming applications are available for free download on the Apple Store, the Samsung Galaxy Store, and the Google Play Store. Am. Compl. ¶ 84; First Chafkin Decl. ¶ 5. Skillz offers hundreds of games on its platform, including games where players can compete to win cash prizes. Am. Compl. ¶¶ 88, 93; First Chafkin Decl. ¶ 5.

The Skillz platform enables third-party developers to match human users in head-to-head competitions and bracketed tournaments based on their relative skill level so that players of the same skill level play against each other. Am. Compl. ¶¶ 85–86. Skillz uses algorithms to match players based on skill level and game history and does not use, operate, or enable computers or artificial competitors to compete in its cash games. Id. ¶¶ 92–93.

Defendant Esport is a game developer that offers its games directly to end users through the Blitz Win Cash App ("Blitz App"). Williams Decl. ¶ 6. The Blitz App, which launched in mid-2021, is available on the App Store and Google Play Store. Am. Compl. ¶ 38, Gordon Decl. ¶¶ 6, 12. On the Blitz App, players compete

---

[3] Unless otherwise noted, the following description of the underlying facts relevant to the pending motion is drawn from (1) the parties' submissions in support of or in opposition to Plaintiff's motion for a preliminary injunction, and (2) portions of the amended complaint which are assumed true for the purposes of this motion. References to these allegations should not be construed as a finding to their veracity.

in head-to-head matchups or in multi-player tournaments against others at similar skill levels, with the opportunity to win cash prizes.  Gordon Decl. ¶¶ 4–6, Ex. C. Defendants Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. jointly promote, operate, and own the Blitz App.  Am. Compl. ¶ 16.

The Blitz App's pages on its website, the Apple App Store, and the Google Play Store describe the Blitz App as having "fair" and "skill-based" games that are played against "real players" with "no bots allowed." Am. Compl. ¶¶ 1–2, 116–123. Defendants have used this language to advertise the Blitz App since at least April 2022.  See Gordon Decl. ¶ 7, Ex. F.  Plaintiff alleges that these advertisements are false because Defendant uses bots in its gaming platforms.  Am. Compl. ¶ 198.

Plaintiff asserts that "[t]hrough its use of bots and false advertising," Defendants are diverting users and revenue from Skillz and "stealing hundreds of millions of dollars" from consumers that play Defendants' games.  Dkt. No. 51 at 2. Plaintiff bases its allegations of Defendants' bot use on "[a]t least one" of Defendants' former employees who has confirmed Defendants' use of bots in cash tournaments. Id. at 6; Am. Compl. ¶ 140.

Plaintiff, as part of its renewed motion for a preliminary injunction, seeks to enjoin Defendants from the following:

- "Disseminating or causing to be disseminated false or deceptive representations that state or imply that (1) [Defendants'] mobile gaming applications are fair; (2) [Defendants'] mobile gaming applications are skill-based; (3) users of [Defendants'] mobile gaming applications will be matched

with 'players' or 'individuals' (including the use of fake usernames and avatars for [Defendants] accounts); (4) [Defendants] do[] not have a financial interest in the outcomes of tournaments played on its mobile gaming applications during the pendency of this litigation; and (5) [Defendants'] mobile games do not use bots in its cash games;" and

- "[U]sing bots in its mobile games during the pendency of this action."

Dkt. No. 50 at 24–25.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction. See Salinger v. Colting, 607 F.3d 68, 79–80 (2d Cir. 2010). The party seeking the injunction must demonstrate "by a clear showing" that the necessary elements are satisfied. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); see Juicy Couture, Inc. v. Bella Int'l Ltd., No. 12 Civ. 5801 (RA), 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013).

Of these factors, irreparable harm is the most important, for if there is no finding of irreparable harm, an injunction cannot issue. See USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1294–95 (2d Cir. 1995). "To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction

6

they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (cleaned up). Generally, irreparable harm may be found "only where there is a threatened imminent loss that will be very difficult to quantify at trial." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995). "In the context of the Lanham Act, where proof of actual or expected lost sales may be difficult to show, some courts find irreparable harm upon a showing that (i) the parties are competitors in the relevant market; and (ii) there is a logical causal connection between the alleged false advertising and the plaintiff's own sales position." Danone, US, LLC v. Chobani, LLC, No. 18 Civ. 11702 (CM), 362 F.Supp.3d 109, 124 (S.D.N.Y. 2019). In assessing causation, a defendant's alleged conduct need not be the sole cause of a plaintiff's sales position. See, e.g., Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 191 (2d. Cir. 1980) ("That much of the decline in [plaintiff's sales] may be due to competition from lower priced [products] does not save [defendant].").

"The movant must establish a likelihood of irreparable harm before the other requirements for the issuance of a preliminary injunction will be considered." In re Keurig Green Mountain Single-serve Coffee Antitrust Litig., No. 14 Mc. 2542 (VSB), 2014 WL 12778832, at *4 (S.D.N.Y. Sept. 19, 2014) (citation omitted). "[I]f a party fails to show irreparable harm, a court need not even address the remaining

elements." Coscarelli v. ESquared Hosp. LLC, No. 18 Civ. 5943 (JMF), 364 F.Supp.3d 207, 221 (S.D.N.Y. 2019) (citation omitted).

Further, it is well established that a court "must consider a plaintiff's delay in seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of relief." Ingber v. N.Y.C. Dep't of Educ., No. 14 Civ. 3942 (JMF), 2014 WL 2575780, at *2 (S.D.N.Y. June 9, 2014) (cleaned up). As the Second Circuit has explained, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." Citibank N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985). A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Id. at 277 (internal quotation marks omitted). Thus, delay, "standing alone," may "preclude the granting of preliminary injunctive relief" because it "suggests that there is, in fact, no irreparable injury." Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks omitted); see also New York v. U.S. Dep't of Com., 18-CV-2921 (JMF), No. 18 Civ. 5025 (JMF), 339 F.Supp.3d 144, 148–49 (S.D.N.Y. 2018). While there is no bright-line rule for how much delay is too much, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F.Supp.2d 417, 419 (S.D.N.Y. 1998) (collecting cases).

## DISCUSSION

### A. Plaintiff fails to establish irreparable harm

Applying those standards here, the Court concludes that Plaintiff fails to establish irreparable harm because 1) Plaintiff unduly delayed in seeking an injunction and 2) Plaintiff's alleged harm is too remote, conclusory, and speculative to warrant a preliminary injunction.

#### a. Delay undercuts sense of urgency

There are three different starting points that could be used to measure whether Plaintiff delayed in seeking a preliminary injunction: 1) the date the alleged false advertising began; 2) the date Plaintiff discovered Defendants' alleged bot use; and 3) the filing of the complaint in the instant case.

Plaintiff does not appear to dispute that Defendants began using the alleged false advertising as early as April 2022, but contends that Defendants offer no authority to suggest that "Lanham Act plaintiffs are required to seek injunctive relief when the false advertising starts." Dkt. No. 80 at 9.   Instead, Plaintiff avers that delay should be measured from the filing of the instant action; and because Plaintiff gave Defendants a "chance to deny its ongoing bot use" two weeks after filing the initial complaint, and moved for injunctive relief five weeks after receiving no response from Defendants, Plaintiff contends they did not delay in seeking relief. Id. at 8.  Further, Plaintiff does not explicitly provide a position as to whether the date Plaintiff discovered Defendants' alleged bot use is the appropriate starting point. Plaintiff did represent to the Court, for the first time during oral argument, that it

9

filed the case "shortly after" its investigation into Defendants' alleged bot use.  Jan.

21, 2026 Hearing Transcript at 4:8–6:2.  However, Plaintiff "couldn't remember the

exact date" and could only represent that "it was leading up to the filing of the

complaint" and that it "was all fairly prompt."  Id.

Plaintiff's arguments are unavailing.  For one, Plaintiff critically offers no

authority to suggest that delay should be measured at the time of the filing of the

complaint. Dkt. No. 80 at 9.  Instead, the Court finds that Plaintiff's time to act began

once Plaintiff learned of the alleged harm.  See, e.g., Citibank N.A., 756 F.2d at 276

(measuring delay starting when plaintiff "learned" of the alleged infringer's plans

"directly"); Monowise Ltd. Corp. v. Ozy Media, Inc., No. 17 Civ. 8028 (JMF), 2018 WL

2089342, at *2 (S.D.N.Y. May 3, 2018) (measuring delay starting when plaintiff

"learned of" the alleged infringement").

Using this as a starting point, Plaintiff here has not met its burden of "coming

forward with evidence to excuse its delay."  Markowitz Jewelry Co. v. Chapal/Zenray,

Inc., No. 97 Civ. 6910 (LAK), 988 F. Supp. 404, 407 (S.D.N.Y. 1997).  Beyond justifying

why it took Plaintiff seven weeks to move for a preliminary injunction after filing this

action, Plaintiff fails to provide *any detail* regarding when it first learned of

Defendants' alleged bot use that triggered investigation into Defendants' alleged false

advertising.  Instead, Plaintiff vaguely asserts, for the first time during oral

argument, that it filed the action "promptly" after its investigation into Defendants'

alleged bot use.  Plaintiff's inability to provide the Court with even approximate dates

on when it first discovered the alleged bot use is concerning, and Plaintiff's lack of

10

justification for its delay ultimately "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Citibank N.A., 756 F.2d at 276.

### b. Alleged injury is remote, conclusory, and speculative

The Court also finds that Plaintiff's claims of irreparable injury are too remote and speculative to justify the emergency intervention it seeks.

First, the Court finds that the parties are competitors in the mobile gaming industry. Both Plaintiff and Defendants offer games where players compete in multiplayer tournaments against others with similar skills levels—Plaintiff through its Skillz Platform and Defendants through the Blitz App. See Am. Compl. ¶¶ 4-5; Gordon Decl., ¶ 4, Ex. C. The Court finds this suffices in establishing the first factor.

However, Plaintiff has failed to establish a logical causal connection between the alleged false advertising and (1) Plaintiff's own sales position or (2) the overall cash gaming market. See Danone, 362 F.Supp.3d at 124.

### i. Lack of causation between alleged false advertising and Plaintiff's own sales position or overall cash gaming market

Plaintiff contends that Defendants' "deceptive use of bots and computer algorithms" (1) diverts customers from Skillz, "resulting in diminished market share" and (2) shrinks the "overall market for mobile cash games, resulting in diminished goodwill and revenue for Skillz, as a member of that market." Dkt. No. 51 at 10; Dkt. No. 80 at 2–3. But Plaintiff's evidence for both arguments is speculative and conclusory at best.

11

Plaintiff notes that because it is particularly difficult in false advertising cases to establish irreparable harm, "a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is attributable to factors other than a competitor's false advertising" and that a plaintiff "need not even point to an actual loss or diversion of sales." Coca-Cola v. Tropicana Prods., Inc., 690 F.2d 312, 316 (2d Cir. 1982). However, a plaintiff "must offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising []; he *must submit proof* which provides a reasonable basis for that belief." Id. (emphasis added). Here, Plaintiff fails to establish a reasonable basis that Defendants played *any role* in the decrease in Plaintiff's own sales position or the overall cash gaming market.

### 1. Plaintiff's own sales position

While Plaintiff has provided sufficient evidence that its sales and market share has decreased since 2021 (see Dkt. No. 51 at 12–14), Plaintiff offers no evidence that Defendants' alleged false advertising played any role in Plaintiff's diminished sales position. For instance, Plaintiff provides no facts, beyond unsubstantiated allegations from the amended complaint and conclusory assertions in a self-serving declaration from Skillz co-founder Casey Chafkin, that Skillz' decrease in revenue/market share is a result of Defendants' alleged false advertising.[4] See, e.g.,

---

[4] The Court declines to consider Exhibits O and P to the Reply Declaration of Craig Carpenito at Dkt. No. 81. Because these two exhibits are dated before the filing of the initial complaint in this action, considering these new materials "would

Second Chafkin Decl. ¶ 3 ("Since August 21, 2024, Skillz continues to lose both market share and revenue to [Defendants] as a result of what I understand to be [Defendants'] false advertisements to customers and use of bots in cash games on its platform."); First Chafkin Decl. ¶ 9 ("Players who do not know that they are playing against bots in tournaments are drawn to bot-enabled games because of fast matching and multi-player tournaments and away from games hosted on Skillz's platform.").

### 2. Overall mobile cash gaming market

Plaintiff's allegations regarding the decrease in the overall market for mobile cash games are even flimsier, as Plaintiff fails to provide sufficient evidence to establish that (1) the overall mobile cash gaming market has decreased or (2) that this alleged decrease was caused, even in part, by Defendants' alleged false advertising. Plaintiff again solely relies on the self-serving Chafkin Declaration as evidence that "[t]he use of bots [] shrinks the overall market for real-cash, skill-based competitive gaming." First Chafkin Decl. ¶ 10 ("When a mobile gaming company like [Defendants] promote[] its games as fair, skill-based tournaments in which [Defendants] [have] no financial stake in the outcome of the game and then matches players against bots programed to take their money, players feel cheated and

---

inappropriately allow [P]laintiff a second bite at the [] apple." Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C., No. 02 Civ. 9742 (SCR) (LMS), 513 F.Supp.2d 18, 20 (S.D.N.Y. 2007); see also Tolliver v. McCants, No. 05 Civ. 10840 (JFK), 2009 WL 1473445, at *3 (S.D.N.Y. May 26, 2009) (declining to consider three articles submitted with a reply brief that "were published well before" the original moving papers where "defendant d[id] not argue that they were unavailable").

typically feel cheated by the industry as a whole."). Thus, aside from mere speculation from Chafkin, Plaintiff provides no "affidavits, emails, letters, or any other form of correspondence from [its] retailers or customers to substantiate [its] claim." Worldwide Diamond Trademarks, Ltd. v. Blue Nile, Inc., No. 14 Civ. 3521 (VSB), 2014 WL 7933941 *3 (S.D.N.Y. Nov. 6, 2014).

Courts in this circuit have frequently rejected such speculative arguments in deciding whether to issue a preliminary injunction. See, e.g., Worldwide Diamond Trademarks, Ltd., 2014 WL 7933941, at *3 (finding no irreparable injury because plaintiff did not provide any evidence "aside from its mere speculation, that it risks losing additional customers"); Marcy Playground, Inc. v. Cap. Records, Inc., 6 F.Supp.2d 277, 282 (S.D.N.Y.1998) ("The only evidence [of irreparable harm is] the conclusory and unsubstantiated assertions of irreparable injury by Kotler and White, the persuasiveness of which is significantly undercut by . . . their manifest self interest. . . . The most that can be said is that they have advanced a speculative theory.").

Given the lack of substantiated evidence that any decrease in Plaintiff's sales or the overall market was a result of Defendants' alleged false advertising, the Court finds that Plaintiff has failed in showing a likelihood of irreparable harm.

### ii. Any likely injury is compensable with money damages

Irreparable harm is defined as "injury for which a monetary award cannot be adequate compensation." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). The Court finds that Plaintiff has failed to show that monetary

compensation would not effectively remediate its injuries.  As discussed *supra,* there is no evidence in the record, beyond mere speculation, supporting Plaintiff's argument that it stands to suffer unquantifiable harm such as a loss of goodwill or a decrease in the overall cash gaming market.  As such, the Court finds that monetary damages would suffice if Plaintiff prevails and therefore injunctive relief is not warranted.

### B. <u>The Court declines to address additional factors</u>

Because Plaintiff has not made the necessary showing of irreparable harm, the Court need not reach the remaining factors.  <u>See, e.g.</u>, <u>Coscarelli</u>, 364 F. Supp. 3d at 221 ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements."); <u>In re Keurig</u>, 2014 WL 12778832, at *11 (declining to address other factors after finding plaintiff failed to show irreparable harm element).

### C. <u>Expedited discovery</u>

"Although generally under [Federal] Rule [of Civil Procedure] 26(d)(1), '[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f),' an exception may be made . . . 'when authorized . . . by court order.'"  <u>Celine S.A. v. Hongkong CSSBUY E-Com. Co., Ltd.</u>, No. 24 Civ. 04627 (JHR), 2024 WL 4627666, at *7 (S.D.N.Y. Oct. 30, 2024) (cleaned up).  "[T]he Second Circuit has yet to articulate a standard for determining whether to allow expedited discovery."  <u>Leslie v. Starbucks Corp.</u>, No. 23 Civ. 1194, 2024 WL 2186232, at *5 n.8 (2d Cir. May 15, 2024) (summary order) ("We see no need to declare a specific standard and instead apply the general abuse of discretion standard that we already apply to discovery-related decisions.").  Although some courts apply a multifactor test

15

that considers the movant's probability of success on the merits and the risk of injury to parties, the more recent trend has been to apply "a more flexible 'good cause' or 'reasonableness' standard." In re Keurig Green Mountain Single-Serve Coffee Antitrust Litg., 14-MD-2542 (VSB), 14-MC-2542 (VSB), 14-CV-905, 14-CV-4242, 2014 WL 12959675, at *1 (S.D.N.Y. July 23, 2024) (collecting cases). "This test requires a district court to examine the request 'on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances.'" Id. (emphasis in original) (citation omitted).

Here, the parties met and conferred pursuant to Rule 26(f) and have commenced discovery in accordance with the discovery schedule entered by the Court on August 7, 2025. See Dkt. No. 126. Discovery has now been underway for six months and the parties have appeared before this Court multiple times for various discovery disputes. Further, based on the preliminary injunction briefing, the Court finds that the expedited discovery Plaintiff seeks would not have been helpful in deciding the instant motion. The Court therefore does not find Plaintiff's expedited discovery request reasonable under the circumstances. As such, Plaintiff's request for expedited discovery is **DENIED**.

## **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Plaintiff's motion for a preliminary injunction and expedited discovery be **DENIED**.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections shall be filed with the Clerk of Court and on ECF. Any requests for an extension of time for filing objections must be directed to Judge Broderick. **Failure to file objections within fourteen days will result in a waiver of objections and will preclude appellate review**. See Thomas v. Arn, 474 U.S. 140 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

SO ORDERED.

DATED:   New York, New York
February 12, 2026

_Jennifer E. Willis_
JENNIFER E. WILLIS
United States Magistrate Judge

17