# EXIHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SKILLZ PLATFORM INC., a Delaware corporation,<br><br>Plaintiff,<br><br>-against-<br><br>VOODOO SAS, a foreign corporation; ESPORT NEWCO SAS, a foreign corporation; and ESPORT NEWCO US CORP., a Delaware corporation,<br><br>Defendants. | Civil Action No.: 24 Civ. 4991 (VSB) (JW)<br><br><br>Hon. Vernon S. Broderick<br><br>Hon. Jennifer E. Willis |

**[PROPOSED]**
**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT OF 1975 TO PERMIT <u>DEPOSITION TESTIMONY</u>**

**SENDER:**
Hon. Jennifer E. Willis
United States District Court for the
Southern District of New York
40 Foley Square, Courtroom 228
New York, NY.
10007

**CENTRAL AUTHORITY OF**
**THE REQUESTED STATE:**
The Senior Master
King's Bench Division
The High Court of Justice
The Strand
London WC2
United Kingdom

**PERSON TO WHOM THE**
**EXECUTED REQUEST IS**
**TO BE RETURNED:**
Sarah Y. Walker
King & Spalding, LLP
8 Bishopsgate

1

London EC2N 4BQ
United Kingdom

In conformity with the Evidence (Proceedings in Other Jurisdictions) Act of 1975 (the "Evidence Act"), the undersigned has the honor to submit the following request:

THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (the "Court"), presents its compliments to The Senior Master, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before the Court in the above-captioned matter. This Court has determined that it would further the interests of justice if the person identified herein is deposed, under oath, as to his knowledge of the facts which are relevant to the issues of this case. The evidence sought by this Letter of Request is not available from other sources.

I.      **THE PARTIES AND THEIR REPRESENTATIVES**

A.      **The Applicant**

The Applicant is SKILLZ PLATFORM INC. ("Plaintiff"). The Applicant may be contacted through its attorneys:

Lazar P. Raynal (*pro hac vice*)
Michael A. Lombardo (*pro hac vice*)
lraynal@kslaw.com
mlombardo@kslaw.com
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333

Craig Carpenito
John Goodwin
Marisa Manzi
Curtis R. Crooke
ccarpenito@kslaw.com
jgoodwin@kslaw.com
mmanzi@kslaw.com
curtis.crooke@kslaw.com
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Tel: (212) 556-2100

2

**B.      The Defendants**

The Defendants are VOODOO SAS, a foreign corporation; ESPORT NEWCO SAS, a foreign

corporation; and ESPORT NEWCO US CORP., a Delaware corporation (collectively, "Defendants").

Defendants are represented by and may be contacted through their attorneys:

Harold K. Gordon
JONES DAY
250 Vesey St.
New York, NY 10281
hkgordon@jonesday.com

Andrea W.
Jeffries 555 S.
Flower Street
Los Angeles, CA 90071
ajeffries@jonesday.com

Michael A. Oblon
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20002
moblon@jonesday.com

Anna E. Raimer
Megan L.
McKeown JONES
DAY
717 Texas Avenue, Suite 3300
Houston, TX 77002
aeraimer@jonesday.com
mmckeown@jonesday.com

**II.      <u>NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS</u>**

**A.      Plaintiff's Allegations**

This is a civil proceeding in which Plaintiff brings false advertising claims under the Lanham Act,

15 U.S.C. § 1125(a)(1), and a related state law claim under New York General Business Law § 349 against

Defendants Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. (collectively, "Voodoo" or

"Defendants"). As detailed in Plaintiff's First Amended Complaint (Ex. 1), Plaintiff alleges as follows:

Plaintiff alleges that Voodoo has engaged in unlawful false advertising and consumer deception by falsely marketing its mobile games offered through the "Blitz Win Cash" application (the "Blitz App") as "fair" and "skill-based" when, in reality, Voodoo fixes the outcome of its tournaments through the use of computer algorithms or "bots." Voodoo populates its tournaments with fake scores and determines how its human players perform relative to those fake scores—and, therefore, how much its human players win or lose to Voodoo.

Plaintiff alleges that Voodoo directly lies about its use of bots to its players and the broader market, promising, for example, on the Blitz Win Cash website: "No bots allowed! Play against real opponents only." Plaintiff alleges that Voodoo flatly and falsely denies its use of bots in its marketing materials and promotional statements—including in response to negative user reviews—in order to fraudulently induce players to keep playing. Voodoo also represents that it does not have a vested interest in who wins or loses, nor does it profit on the outcome of matches and tournaments on its application. Plaintiff asserts that these representations are false.

Plaintiff states that Voodoo's use of algorithms to determine the outcome of its tournaments turns what might otherwise be legal games of human skill into illegal games of chance or gambling in which Voodoo's unwitting participants have little or no influence on the outcome. Plaintiff's position is that by deploying bots or algorithms to determine how much players win when their money is on the line, Voodoo generates revenue for itself with each game played. At least one former Voodoo employee—the Deponent, Ido Naim—disclosed Voodoo's use of bots during an interview with Skillz's Chief Executive Officer in the Spring of 2024.

Plaintiff claims that, as a result of Voodoo's false and misleading statements and use of bots, Skillz has lost customers (including prospective customers) and has been damaged, including by way of lost market share, revenue, and profits. Skillz and Voodoo are direct competitors in the mobile gaming industry, offering similar games on similar platforms with cash prizes. Plaintiff believes that Voodoo's

4

use of bots steals market share and revenue from Skillz by artificially inflating player liquidity on Voodoo's platform, allowing Voodoo to match players into games faster than would be possible if the application relied solely on live human players, as does Skillz.

**B.    The Requested Discovery**

In order to establish the complete facts necessary to prosecute this action fully, Plaintiff is seeking to obtain deposition testimony from Ido Naim. Naim is a former executive at Voodoo SAS who served as Head of Monetization & Analytics and later Vice President of GameOps & Analytics at Voodoo from approximately January 2020 until June 2021. During his tenure, a subsidiary of Voodoo was developing the Blitz Win Cash application, and Naim provided pre-launch assistance to the development team.

Following his departure from Voodoo, Naim interviewed for an executive position at Skillz in the Spring of 2024. During his interview, Plaintiff allege that Naim met with Skillz's Chief Executive Officer, Andrew Paradise, and disclosed that "Voodoo is running bots in Blitz," that "Voodoo is the Wild West," and that Voodoo did not follow regulations in a manner consistent with Naim's prior employers. Mr. Paradise's contemporaneous notes of Naim's admissions were maintained as ordinary course business records.

On April 6, 2026, Defendants filed the sworn Declaration of Ido Naim in which Naim purports to deny confirming Voodoo's use of bots to anyone at Skillz. However, Naim's declaration is carefully worded and is contradicted by documentary evidence. Naim states only that he never "confirmed" bot use—not that he never discussed it—and his declaration does not deny that Voodoo uses bots on the Blitz App. Naim's deposition testimony is therefore essential to probe the veracity of his declaration, to test his carefully crafted denials against the contemporaneous documentary record, and to obtain his direct testimony regarding Voodoo's use of bots.

**C.    Knowledge of the Person to Be Examined**

Plaintiff believes that the Deponent has unique knowledge about critical facts underlying this

5

action. As set forth below, the Deponent was a senior executive at Voodoo SAS with direct involvement in the company's mobile gaming operations, including providing pre-launch assistance on the Blitz Win Cash application at the center of this litigation. The testimony that Plaintiff seeks from the Deponent is thus highly relevant to Plaintiff's allegations.

### 1.    Ido Naim

Ido Naim is a British citizen residing in London, England. Naim is an executive specializing in operations, monetization, and retention in the mobile gaming space. From approximately January 2020 to June 2021, Naim was employed by Voodoo SAS in senior leadership roles, first as Head of Monetization & Analytics and then as Vice President of GameOps & Analytics.

During his employment at Voodoo, Naim was aware that a subsidiary of Voodoo was developing the Blitz Win Cash application. Although Naim claims he was not formally assigned to the Blitz project, he admits to providing "pre-launch assistance" to the development team. Naim's own contemporaneously-documented statements during his 2024 interview process with Skillz indicate that he "[m]oved to Voodoo and managed their operations for hypercasual games" including "Blitz." Naim thus had direct knowledge of the Blitz App's development.

Naim's testimony is critical for several reasons. First, Naim is the individual identified in Plaintiff's Complaint and Amended Complaint as the former Voodoo employee who disclosed Voodoo's use of bots in cash tournaments. During his interview at Skillz in the Spring of 2024, Naim told Skillz's CEO, Andrew Paradise, that "Voodoo is running bots in Blitz" and that "Voodoo is the Wild West." Mr. Paradise's contemporaneous notes of these disclosures were maintained as ordinary course business records and constitute key evidence supporting Plaintiff's allegations.

Second, Defendants have submitted a sworn declaration from Naim in this case in which he purports to deny confirming Voodoo's use of bots. However, Naim's declaration is evasive and contradicted by the documentary record. Naim carefully states that he never "confirmed" bot use—not

that he never discussed, indicated, disclosed, or shared information about bots during his interview. Naim also disclaims having discussed "bots" with anyone at Voodoo, but notably does not make the same denial with respect to his conversations with individuals at Skillz. A deposition is essential to probe these carefully worded denials and to obtain Naim's testimony regarding the full scope of his knowledge.

Third, Naim's testimony is uniquely valuable because of his senior-level position at Voodoo SAS during the period when the Blitz App was being developed. As Vice President of GameOps & Analytics, Naim had access to high-level and detailed information regarding the use of bots in the Blitz App. Additionally, the filing of Naim's declaration by Defendants further confirms that Voodoo SAS—which has sought to avoid this litigation by claiming it does not operate the Blitz App—is properly a defendant in this case, as Naim admits he was employed by Voodoo SAS and provided pre-launch assistance on the Blitz application.

## III.     **ADDRESS OF THE PERSONS TO BE EXAMINED**

Ido Naim
Personal mailing address unknown
Senior Director of Monetization at Zynga
6 Agar Street
London, United Kingdom, WC2N 4HN

## IV.     **PROCEDURAL STATUS OF THE CASE**

This case is currently in the pretrial fact discovery phase. Plaintiff is reviewing documents produced by Defendants. The fact discovery deadline is currently August 14, 2026.

## V.     **EVIDENCE TO BE OBTAINED**

### A.  Purpose

The evidence to be obtained consists of testimony for use in court proceedings, motion practice, including dispositive motions such as motions for summary judgment, and trial by jury of this action and is necessary for the just and proper disposal of the proceeding before this Court. This Court respectfully requests the Senior Master of the King's Bench Division of the High Court to require the Deponent to

appear and to be deposed, under oath.

### B. Relevant Time Period.

All testimony relates to the period from January 1, 2020 (when the Deponent joined Voodoo) through the present.

### C. Topics for Examination

Examination will cover alleged bot use in the Blitz Win Cash Application.

## VI.    Other Matters

### A. Requirement that the Evidence be Given Under Oath and Special Form to Be Used

This Court respectfully requests that you require the testimony given during the deposition to be given under the following oath, "I, [deponent's name], swear or affirm that the testimony that I am about to give is the truth, the whole truth, and nothing but the truth." In the event that the law of the U.K. does not permit the swearing of an oath by a witness, the duly appointed officer shall make an inquiry of such witness to ensure that he understands the gravity of the procedure and affirms that his statement will be true and correct in all respects.

### B. Special Methods of Procedures to Be Followed

1.    This Court respectfully requests that the deposition be taken in the manner provided by the United States Federal Rules of Civil Procedure 28 and 30, copies of which are attached hereto as Exhibit 2.

2.    This Court respectfully requests that the depositions be taken orally and be recorded verbatim in writing, and videotaped, and that the transcription of the testimony be authenticated in accordance with your procedure. With respect to the transcript of the testimony, we request that we be permitted to provide a court reporter to transcribe the oral examinations.

3.    This Court respectfully requests that counsel for Plaintiff and Defendants be permitted to attend the depositions, and further requests that the Deponent be examined by counsel for Plaintiff and

8

Defendants.

**C. Request for Notification of the Time and Place for the Execution of the Request and the Identity and Address of the Person to Be Notified.**

4.      The Court respectfully requests that the depositions commence on a date as soon as practical and in all events prior to August 14, 2026, at the offices of:

Sarah Y. Walker
King & Spalding, LLP
8 Bishopsgate
London EC2N 4BQ
United Kingdom

In scheduling the deposition, counsel for Plaintiff will work with the Deponent in an effort to accommodate their schedule and minimize any inconvenience.

5.      The Court respectfully requests the following people be notified:

Lazar P. Raynal (pro hac vice)
Michael A. Lombardo (pro hac vice)
lraynal@kslaw.com
mlombardo@kslaw.com
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333

Craig Carpenito
John Goodwin
Marisa Manzi
Curtis R. Crooke
ccarpenito@kslaw.com
jgoodwin@kslaw.com
mmanzi@kslaw.com
curtis.crooke@kslaw.com
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Tel: (212) 556-2100

*Attorneys for Skillz Platform Inc.*

Harold K. Gordon
JONES DAY
250 Vesey St.
New York, NY 10281

9

hkgordon@jonesday.com

Andrea W.
Jeffries 555 S.
Flower Street
Los Angeles, CA 90071
ajeffries@jonesday.com

Michael A. Oblon
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20002
moblon@jonesday.com

Anna E. Raimer
Megan L.
McKeown JONES
DAY
717 Texas Avenue, Suite 3300
Houston, TX 77002
aeraimer@jonesday.com
mmckeown@jonesday.com

***Attorneys for Defendants Voodoo SAS,
Esport Newco SAS, and Esport Newco
US Corp.***

**D.  Expenses.**

Expenses incurred which are reimbursable under §2(5) of the Evidence Act will be borne by the

Plaintiff. Plaintiff's payment of any expenses is without prejudice to their making a subsequent request to

be reimbursed for these costs by other parties to the action.

_____                                         _____

Date                                                          Hon. Jennifer E. Willis

10

# EXIHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SKILLZ PLATFORM INC.,
a Delaware corporation,

       Plaintiff,

              -against-

VOODOO SAS, a foreign corporation;
ESPORT NEWCO SAS, a foreign
corporation; and ESPORT NEWCO US
CORP., a Delaware corporation,

       Defendants.

Civil Action No.: 24 Civ. 04991 (VSB)

**FIRST AMENDED COMPLAINT**

Plaintiff Skillz Platform Inc. ("Skillz" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. (together, "Voodoo," or "Defendant") and alleges as follows:

## I.      INTRODUCTION

1.      This action challenges Defendant Voodoo's unlawful conduct and fraud on the public in falsely advertising its mobile games offered through the "Blitz Win Cash" application as "fair" and "skill-based" when Voodoo is fixing the outcome of its tournaments through the use of computer algorithms or "bots." Indeed, Voodoo populates its tournaments with fake scores and determines how its human players perform as relative to those fake scores—and, therefore, how much its human players win or lose to Voodoo.

2.      Voodoo expressly and unconsciously lies about its use of bots to its players and the broader market, promising, for example, on the Blitz Win Cash website: "No bots allowed! Play against real opponents only." And flatly (and falsely) denies its use of bots in its marketing

materials and promotional statements, including in response to negative user reviews, in order to fraudulently induce skeptical players to keep playing.

3.      Voodoo's use of algorithms to determine the outcome of its tournaments turns what might otherwise be legal games of human skill into illegal games of chance or gambling in which Voodoo's unwitting participants have little or no influence on the outcome of any game. And, by deploying bots or algorithms to determine how much players win when their money is on the line, Voodoo can generate revenue for itself with each game played.

4.      Over the past ten years, the mobile gaming industry, which was largely created by Plaintiff Skillz, has skyrocketed in popularity. Skillz's revolutionary gaming platform hosts Skillz games such as "Solitaire Cube" and "21 Blitz," and it pairs people in head-to-head, skill-based competitions with cash prizes on the line. Skillz matches competitors based on their level of ability; accordingly, the speed of Skillz's player matching process varies depending on how many players, and at what skill level, are active on Skillz's platform at any given time.

5.      Voodoo, like with a number of more recent entrants to the mobile gaming market, capitalized on Skillz's success by launching the application "Blitz Win Cash," which offers imitations of Skillz's games, with similar objectives, game play, and financial stakes for players. Although Voodoo advertises that "everybody has an opportunity to win!" when playing its games, the outcome of its games are manipulated and controlled by Voodoo. By using algorithms to control the rate at which players win, Voodoo can maximize its profits by letting players win just enough that they don't quit and leave the platform altogether.

6.      Voodoo has deceived thousands of consumers—many of whom have relied on Voodoo's false and misleading representations about its player base—who have paid to play Voodoo games against other players of their skill level. Throughout its website and apps, Voodoo

2

claims, "[t]his is not just any gaming app, it's a fair, skill-based competition app." Furthermore, Voodoo represents that "rivals are at a similar level, so everybody has an opportunity to win!" Voodoo claims to be available only to players who are 21 years of age or older. Voodoo also represents that it does not have a vested interest in who wins or loses nor does it profit on the outcome of matches and tournaments on its application. All of these statements—and countless others made by Voodoo both on its mobile application and elsewhere—are false and misleading.

7. Voodoo's false and deceptive marketing materials, advertisements, and other public statements—along with its use of bots in and of itself—violate the Lanham Act's prohibition on false advertising. Its use of bots (and hiding those bots) also violates New York's ban on deceptive acts or practices in the conduct of business. Voodoo's misconduct is underscored by its claims to prohibit the "[u]se of any automated system (e.g., robots, automatic, macro, programmed, or like entry methods)" in its games. The same goes for its claims to prohibit "any form of gambling" in its games, because it functions as the "house" at a casino, collecting money from participants who compete against—and often lose to—the "house" through Voodoo's use of algorithms. When Voodoo's bots win a match or a tournament, Voodoo keeps the amount of the entry fees paid by the human players who lose.

8. Voodoo's use of bots means all of its games are not skill-based—i.e., based on the skill of the player, with no random events bearing on the result. At best, Voodoo's games are games of chance, because a live player's skill level may not have an impact on each game's outcome. At worst, Voodoo's conduct is nothing short of theft.

9. As a result of Voodoo's false and misleading statements and use of bots, Skillz has lost customers (including prospective customers) and has been damaged, including by way of lost market share, revenue, and profits.

3

## II.   THE PARTIES

10.     Plaintiff Skillz is a Delaware corporation with its principal place of business at 6625 Badura Avenue, Las Vegas, Nevada 89118.

11.     Defendant Voodoo SAS is a foreign corporation with its principal place of business at 320 Rue Saint-Honore, 75001 Paris, France.

12.     Defendant Esport Newco SAS is a foreign corporation with its principal place of business at 320 Rue Saint-Honore, 75001 Paris, France.

13.     Defendants Voodoo SAS and Esport Newco SAS share an office and principal place of business at 320 Rue Saint-Honore, 75001 Paris, France.

14.     Defendant Esport Newco US Corp. is a Delaware corporation. On information and belief, Esport Newco US Corp. is a subsidiary of Defendant Esport Newco SAS, and its principal place of business is located within this District, at 268 Elizabeth Street, New York, NY 10012.

15.     Defendant Esport Newco US Corp. is registered to accept service within this District.

16.     Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. jointly promote, operate, and own the Blitz Win Cash application.

17.     Upon information and belief, Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. jointly develop the Blitz Win Cash application.

18.     Voodoo SAS is the parent company of Esport Newco SAS and Esport Newco US Corp.[1] As a result, Voodoo SAS is an affiliate of Esport Newco SAS and Esport Newco US Corp. Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. are all affiliates of each other.

---

[1] Ex. E (Rule 7.1 Disclosure Statement for Defendants).

19.     Under Blitz Win Cash's Terms and Conditions, as an affiliate of Esport Newco SAS and Esport Newco US Corp., Voodoo SAS is a party to Blitz Win Cash's Terms and Conditions.[2] Specifically, Blitz Win Cash's Terms and Conditions state that "[t]he Application is provided and maintained by ESPORT NEWCO (910 410 356 R.C.S) *and Affiliates*[,]" which includes Voodoo SAS. (emphasis added).

20.     As affiliates of Esport Newco SAS, Voodoo SAS and Esport Newco US Corp. are parties to Blitz Win Cash's Privacy Policy.[3] Blitz Win Cash's Privacy Policy states that "ESPORT NEWCO SAS *and Affiliates* ('Blitz - Win Cash', 'We', 'Our', or 'Us') are committed to protecting and respecting your privacy." (emphasis added).

21.     Voodoo SAS owns the website available at http://www.voodoo.io.[4]

22.     Voodoo SAS advertises the Blitz Win Cash application. When users open the Blitz Win Cash application, the very first screen they see indicates that the application is created "by Voodoo[.]"[5]

---

[2] Ex. F (Blitz Win Cash Terms and Conditions).
[3] Ex. G (Blitz Win Cash Privacy Policy).
[4] Ex. H (Voodoo Terms and Conditions).
[5] Ex. I (Blitz Win Cash Application home screen).



23.     The front page of Voodoo SAS's website, available at https://voodoo.io, as captured on September 19, 2024, shows Blitz Win Cash's icon (*see* red circled image) on the top right of its homepage.[6]



<hr>

[6] Ex. J (https://voodoo.io front page, as of September 19, 2024).

24.     That same front page of Voodoo SAS's website (from September 19, 2024) shows Blitz Win Cash's icon (*see* red circled image) once again, this time farther down next to a heading reading "APPS: We create entertaining apps" and a link to the "Apps" tab of the website.[7]



25.     That "Apps" tab of Voodoo SAS's website, https://voodoo.io, as captured on August 22, 2024, advertises Blitz Win Cash as one of its apps.[8] The "Apps" tab opens with the below header:



---

[7] *Id.*
[8] Ex. K (https://voodoo.io "Apps" page, as of August 22, 2024).

And, after scrolling on the page, the "Apps" tab shows the below banner advertising Blitz Win Cash:



26.     As of October 2, 2024, Voodoo SAS has updated its website, available at https://voodoo.io, and still identifies Blitz Win Cash multiple times on the front page. The top of that animated page shows Blitz Win Cash's icon (*see* red circled image) spinning around a globe under the heading, "Entertain the word with iconic apps and games[.]"[9]

---

[9] Ex. L (https://voodoo.io top of front page, as of October 2, 2024).



27.     After scrolling down that updated animated front page, Voodoo SAS's website once again identifies Blitz Win Cash as one of its apps.[10]



28.     Neither Esport Newco SAS nor Esport Newco US Corp. appears to have a website. Only Voodoo SAS's website advertises Blitz Win Cash.

---

[10] Ex. M (https://voodoo.io bottom of front page, as of October 2, 2024).

29.    In announcing Voodoo SAS's acquisition of an application called BeReal, Voodoo SAS published a LinkedIn post that features an image of a phone screen that purportedly contains icons of Voodoo SAS's gaming applications. The image of that phone screen includes Blitz Win Cash's icon (*see* red circled image).[11]



30.    Blitz Win Cash's Facebook page lists "Voodoo Labs" as "responsible for this Page[.]"[12]



---

[11] Ex. N (Voodoo LinkedIn post advertising BeReal).
[12] Ex. O (Blitz Win Cash's Facebook front page).

31.     Blitz Win Cash users have made online posts reflecting that payouts from Blitz Win Cash are made by Voodoo SAS. These posts also indicate that Voodoo SAS has a financial interest in Blitz Win Cash games. For example, a user posted a video of her Blitz Win Cash account activity on social media, showing numerous payments transferred into and out of her Blitz Win Cash account by Voodoo SAS.[13]

---

[13] @BossMayne Mika, FACEBOOK (July 8, 2023),
https://www.facebook.com/100011321802862/posts/1945178319202876/?mibextid=WC7FNe&
rdid=Im5MwGStgjFFN8qC.



32.     Another user made a post on an internet forum stating that the "PayPal payouts" that user received for playing Blitz Win Cash came from "Voodoo SAS[.]"[14]

---

[14] Ex. P (Reddit post regarding Voodoo SAS payouts).



**r/referralcodes** • 1 yr. ago
Alternative_Neck499

## Blitz win cash referral code clZXh

Code: clZXh

Gives $10 bonus cash!

I've won over $500 in about 3 months - just don't be an idiot and lose money. If you're good at games you can win money with the bonus cash. Don't buy offers more than like

Voodoo SAS owns blitz which is why my PayPal payouts are from them

33.     A similar post by that same user also includes a screenshot of Blitz Win Cash account activity showing numerous payments transferred into and out of a Blitz Win Cash account by Voodoo SAS.[15]

---

[15] Ex. Q (Reddit post regarding Voodoo SAS payouts with screenshot of payments).



34.     Voodoo SAS advertises for jobs at Blitz Win Cash. For example, "Voodoo" advertised a role for a "Customer Support Agent" at Blitz.[16] According to the posting, the "role [was] in the Blitz team, a gaming platform launched by Voodoo in 2021." The advertisement goes

---

[16] Ex. R (Customer Support Agent job posting).

on to state that "Blitz is a mobile app focused on eSport competitions, allowing to play many games to enjoy, practice, and compete with other players. Blitz allows you to play a large variety of competitive modes including 1v1 matches, tournaments, and high score events."

35.    "Voodoo" also advertised an opening for "Head of Operations" at Blitz. The role advertised that the candidate would "be in charge of all operations at Blitz, the new gaming platform launched by Voodoo[.]"[17]

36.    The "Jobs" link on Blitz Win Cash's website directs to Voodoo SAS's jobs page. This suggests that Voodoo SAS appears to aid in operating Blitz Win Cash (*see* red circled images).[18]



37.    A LinkedIn posting from Voodoo.io looks to fill positions on the "Blitz team[.]"[19]

38.    The Employer Branding Manager at "Voodoo" also advertised a role for Senior UI/UX Designer at Blitz.[20] She states that "Blitz is a gaming platform launched by Voodoo in 2021[.]"

---

[17] Ex. S (Head of Operations job posting).
[18] Ex. T (https://blitz-app.io/ front page).
[19] Ex. U (LinkedIn job posting).
[20] Ex. V (Senior UI/UX Designer job posting).

39.     Voodoo has also advertised a job opening for a "Senior Game Artist – Blitz[.]" The advertisement notes that "Blitz is a gaming platform launched by Voodoo in 2021" and seeks a "Game Artist [who] will play a key role in the development of Blitz, our real-money gaming platform."[21]

40.     These job postings indicate that employees of Voodoo SAS participated in the development of Blitz Win Cash.

41.     Moreover, current officers and employees of Voodoo SAS are affiliated with Esport Newco SAS and Blitz.

42.     The co-founder of Voodoo SAS, Alexandre Yazdi,[22] owns 26.58% of the units and has a 45% voting share of Esport Newco SAS.[23]

43.     In a December 5, 2023 blog post, Yazdi touts the "ramp up" of Blitz in 2022.[24]

44.     The founder and CEO of Blitz, Pierre-Olivier Corvol, lists Voodoo.io as his employer on LinkedIn, along with the Blitz Win Cash logo.[25]

---

[21] Ex. W (Senior Game Artist job posting).
[22] Ex. X ("10 Years at Voodoo" blog post).
[23] Ex. Y (Esport Newco SAS ownership information).
[24] Ex. X ("10 Years at Voodoo" blog post).
[25] Ex. Z (LinkedIn profile – Corvol).



45.     Corvol is also the president of Esport Newco SAS.[26]

46.     The Blitz's current CEO, and former Director of Operations, lists Voodoo as his employer on LinkedIn.[27]

---

[26] Ex. AA (Esport Newco SAS management information).
[27] Ex. BB (LinkedIn profile – Haroune).



47.     On information and belief, Voodoo SAS, Esport Newco SAS and Esport Newco US Corp. operate as alter egos of one another. For example, Voodoo SAS and Esport Newco SAS

share an address, Voodoo SAS advertises the Blitz Win Cash application, Voodoo SAS issues payments to Blitz Win Cash users, and there is significant overlap among the entities' officers, directors, and personnel.

48. On information and belief, neither Esport Newco SAS nor Esport Newco US Corp. have employees that do not also work for Voodoo SAS.

49. On information and belief, Voodoo SAS, Esport Newco SAS and/or Esport Newco US Corp. have a regular and established place of business in this District located at 268 Elizabeth Street, New York, NY 10012.

50. In the alternative, Voodoo SAS is an agent of Esport Newco SAS and/or Esport Newco US Corp.

### III.   JURISDICTION AND VENUE

51. This is a civil action for false advertising arising under the Lanham Act, 15 U.S.C. § 1125(a) and a related state law claim.

52. This Court has subject-matter jurisdiction over the matters asserted herein under 28 U.S.C. § 1331.

53. This Court has supplemental subject matter jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a). The state law claim asserted herein is related to the Lanham Act claim, is built on the same factual predicates, and is part of the same case and controversy.

54. Voodoo SAS, Esport Newco SAS, and Esport Newco US Corp. all heavily advertise the Blitz Win Cash application specifically to customers located in New York, New York.

55. For instance, on December 12, 2022, Defendants, which control the Blitz Win Cash TikTok account, published a video on TikTok with the headline: "We're taking over NYC!"[28]

[28] Blitz – Win Cash (@blitzwincash), TɪᴋTᴏᴋ (Dec. 22, 2022), https://www.tiktok.com/@blitzwincash/video/7179969566850780421.

19



56.     Blitz Win Cash's video was filmed in "Times Square – New York" and highlighted a jumbotron in Times Square advertising Blitz Win Cash—touting, "Play Games Win Cash!"[29]



57.     The video goes on to portray the New York City subway with advertisements for Blitz Win Cash in its trains and stations, and a Blitz Win Cash player standing in Times Square.

---

[29] *Id.*

The video features Frank Sinatra's song "New York, New York," and Jay-Z and Alicia Keys' song

"Empire State of Mind" as its soundtrack.[30]



---

[30] *Id.*



58.     Voodoo SAS posted a second video of Blitz Win Cash's Times Square jumbotron advertisement on its LinkedIn account, this one featuring a second jumbotron that reads "Blitz Win Cash" (in addition to the jumbotron encouraging consumers to "Play Games Win Cash!").[31]

---

[31] Enzo Biancolli, LINKEDIN, https://www.linkedin.com/posts/enzo-biancolli_blitz-win-cash-is-taking-over-nyc-with-billboards-activity-7009104452531965952-WZtI (last visited Oct. 2, 2024).



59.    On January 23, 2023, Defendants, through the "Blitz Win Cash" TikTok account, posted another video on TikTok from "Times Square – New York" in which an interviewer

encourages someone to start playing Blitz Win Cash's games to "win real money."[32] This video also features Blitz Win Cash's Times Square jumbotrons.



    60.    On December 14, 2022, Defendants, through the "Blitz Win Cash" Facebook account, advertised a "special meet-up" in Brooklyn, New York, via social media.[33]

---

[32] Blitz – Win Cash (@blitzwincash), TIKTOK (Jan. 23, 2023), https://www.tiktok.com/@blitzwincash/video/7191850467528346886.

[33] Ex. CC (Blitz Win Cash's Facebook meet-up advertisement).

61.     This Court has personal jurisdiction over Voodoo SAS, in part because Voodoo SAS does continuous and systematic business in this District, including by soliciting business from the residents of this District[34] and by having customers located in this District.[35] Voodoo SAS has a "team of over 750 employees worldwide[,]"[36] including several employees located in the United States.[37] Voodoo SAS also has several employees based in New York.[38] Voodoo SAS also solicits new New York-based employees via its public job postings.[39] In addition, Voodoo SAS, directly and through agents, regularly does, solicits and transacts business in this District and elsewhere in the State of New York, including through its websites at https://blitz-app.io/ and https://www.voodoo.io/, as well as its various standalone game applications,[40] all of which are marketed, offered, distributed to, and utilized by users of mobile devices in this District and throughout the State of New York.

62.     This Court has personal jurisdiction over Esport Newco SAS, in part because Esport Newco SAS does continuous and systematic business in this District, including by soliciting

---

[34] On the website for Blitz Win Cash, Voodoo SAS, as an affiliate of "ESPORT NEWCO" states that it is open to residents in New York, to the exclusion of numerous other states. Ex. F (Blitz Win Cash Terms and Conditions) § 2.3. Blitz Win Cash's Terms and Conditions also contain an arbitration clause which states that an "any arbitration hearing will take place in Paris, France (or New York City for U.S. residents)." *Id.* § 11.1.

[35] For example, https://www.facebook.com/Blitzwincash/ and https://www.facebook.com/voodoogames/ identifies Blitz Win Cash players and Voodoo users that are based in this District.

[36] Ex. DD (LinkedIn overview of Voodoo).

[37] Ex. EE (LinkedIn profile – Kilaru); Ex. FF (LinkedIn new hire announcement); Ex. GG (LinkedIn profile – Sutter); Ex. HH (LinkedIn profile – Mussman).

[38] Ex. BB (LinkedIn profile – Haroune); Ex. II (LinkedIn profile – Yusuf).

[39] Ex. JJ (LinkedIn job postings); Ex. KK (https://voodoo.io "Careers" page).

[40] Voodoo SAS's gaming applications include, but are not limited to, Blitz Win Cash, Paper.io, HexaBlast Puzzle, Bubble Tower 3D!, and Color Solitaire 3D, all of which are available for free download on the Apple App Store.

business from the residents of this District[41] and by having customers located in this District.[42] In addition, Esport Newco SAS, directly and through agents, regularly does, solicits and transacts business in this District and elsewhere in the State of New York, including through its websites at https://blitz-app.io/ and https://www.voodoo.io/, as well as its various standalone game applications,[43] all of which are marketed, offered, distributed to, and utilized by users of mobile devices in this District and throughout the State of New York.

      63.     This Court has personal jurisdiction over Esport Newco US Corp., in part because Esport Newco US Corp. does continuous and systematic business in this District, including by soliciting business from the residents of this District,[44] including for the Blitz Win Cash application, and by having customers located in this District ,[45] including of Blitz Win Cash. For example, Esport Newco US Corp. has an active authorization to do business on file with the Secretary of State of New York stating that its office is to be located in New York County. Esport Newco US Corp. has listed its registered agent as CT Corporation System, located at 28 Liberty

---

[41] On the website for Blitz Win Cash, Esport Newco SAS and Affiliates (including Voodoo SAS) state that the application is open to residents in New York, to the exclusion of numerous other states. Ex. F (Blitz Win Cash Terms and Conditions) § 2.3. Blitz Win Cash's Terms and Conditions also contain an arbitration clause which states that an "any arbitration hearing will take place in Paris, France (or New York City for U.S. residents)." *Id.* § 11.1.

[42] For example, https://www.facebook.com/Blitzwincash/ and https://www.facebook.com/voodoogames/ identifies Blitz Win Cash players and Voodoo users that are based in this District.

[43] Esport Newco SAS's gaming applications include, but are not limited to, Blitz Win Cash, Paper.io, HexaBlast Puzzle, Bubble Tower 3D!, and Color Solitaire 3D, all of which are available for free download on the Apple App Store.

[44] On the website for Blitz Win Cash, Esport Newco US Corp. and its Affiliates (including Voodoo SAS) states that the application is open to residents in New York, to the exclusion of numerous other states. Ex. F (Blitz Win Cash Terms and Conditions) § 2.3. Blitz Win Cash's Terms and Conditions also contain an arbitration clause which states that an "any arbitration hearing will take place in Paris, France (or New York City for U.S. residents)." *Id.* § 11.1.

[45] For example, https://www.facebook.com/Blitzwincash/ and https://www.facebook.com/voodoogames/ identifies Blitz Win Cash players and Voodoo users that are based in this District.

Street, New York, NY 10005. In addition, Esport Newco US Corp., directly and through agents, regularly does, solicits and transacts business in this District and elsewhere in the State of New York, including through its websites at https://blitz-app.io/ and https://www.voodoo.io/, as well as its various standalone game applications,[46] all of which are marketed, offered, distributed to, and utilized by users of mobile devices in this District and throughout the State of New York.

64.     As a result of the above, this Court has general jurisdiction over Voodoo SAS under New York Civil Practice Law and Rules § 301 because Voodoo SAS solicits business in New York, and has employees located here.

65.     As a result of the above, this Court has personal jurisdiction over Voodoo SAS under New York Civil Practice Law and Rules § 302(a)(1)–(3).

66.     As a result of the above, this Court has general jurisdiction over Esport Newco SAS under New York Civil Practice Law and Rules § 301 because Esport Newco SAS solicits business in New York.

67.     As a result of the above, this Court has personal jurisdiction over Esport Newco SAS under New York Civil Practice Law and Rules § 302(a)(1)–(3).

68.     In the alternative, this Court has personal jurisdiction over Defendants Voodoo SAS and Esport Newco SAS under Rule 4(k)(2) of the Federal Rules of Civil Procedure. Skillz's Lanham Act claim against Defendants Voodoo SAS and Esport Newco SAS arise under federal law. Further, to the extent Defendants Voodoo SAS and Esport Newco SAS challenge that Defendants Voodoo SAS and Esport Newco SAS are not subject to personal jurisdiction by this Court (and this Court agrees with that argument), Defendants Voodoo SAS and Esport Newco SAS

---

[46] Esport Newco US Corp.'s gaming applications include, but are not limited to, Blitz Win Cash, Paper.io, HexaBlast Puzzle, Bubble Tower 3D!, and Color Solitaire 3D, all of which are available for free download on the Apple App Store.

would not, in that case, be subject to jurisdiction in any state's courts of general jurisdiction. Defendants Voodoo SAS and Esport Newco SAS are foreign-based entities, that have a U.S. location in New York, as alleged above. This Court's exercise of personal jurisdiction under Rule 4(k)(2) would be consistent with due process, as Defendants Voodoo SAS and Esport Newco SAS advertise and market their platform throughout the United States and solicit customers throughout the United States.

69.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because Voodoo has committed unfair acts in this District and has a regular and established place of business in this District. Further, venue is proper as to Voodoo SAS and Esport Newco SAS under 28 U.S.C. § 1391(c)(3) as they are foreign entities.

## IV.     FACTUAL ALLEGATIONS

**A.     Skillz's Innovations Helped Establish Today's Mobile Gaming Industry**

70.     Skillz was founded in October 2012 in Boston, Massachusetts.

71.     At that time, despite the popularity of video games, video gamers had limited to no options to compete and profit from their skill and dedication. Although athletes in physical sports could earn millions of dollars through competition—not to mention recognition, respect, endorsements, and countless other opportunities—the technology to afford video gamers similar opportunities had not yet been developed. Skillz now awards approximately $2 million in prizes to players each week.

72.     Skillz makes a mobile gaming platform, also referred to as an eSports platform. Rather than hoard its technology, Skillz opened its platform to third-party game developers to maximize the impact and reach of its innovation.

73. To create the Skillz platform, Skillz developed several groundbreaking technologies.

74. First, to guarantee the fairness and integrity of every competition on the Skillz platform, Skillz developed a technology that allows head-to-head gameplay between competitors within an online digital game competition, while also allowing games to be different across different competitions. This novel technology allows competitions to be skill-based even when the games have random elements associated with them, such as the starting hand and deck in a head-to-head game of solitaire.

75. In addition, to ensure that players can compete for cash in compliance with restrictions against cash-based competitions in certain states—and that players could be discouraged from cheating given the real-money stakes—Skillz developed technology that allows only players in states that allow cash-based competitions to play for real money and creates an electronic record of their in-game actions as an anti-cheating measure. By determining players' locations via GPS, cash-based competitions can be offered to users anywhere those competitions are permitted. And, by maintaining electronic records of each competitor's in-game actions that are also made available to other competitors, the possibility of cheating is minimized.

76. Fueled in part by Skillz's revolutionizing technology and collaborative business model, the mobile gaming industry exploded, and Skillz became one of the fastest growing companies in the United States.

77. Skillz's technology and drive has helped launch mobile gaming into the mainstream. Though Skillz's impact cannot be quantified in numbers alone, the numbers speak volumes.

78.     The first Skillz-powered gaming app went live in April 2013. By July 2014, Skillz had paid out over $1 million in cumulative prize money. By June 2015, that number had increased to $10 million. In December 2015, it reached $20 million.

79.     In January 2016, Skillz launched cross-platform multiplayer technology allowing Android and iOS users to play in the same competitive video game tournaments. That year, Skillz accounted for 46% of all mobile gaming prizes awarded.

80.     In November 2017, Skillz launched multi-app chat technology, allowing players to communicate on its platform as they play.

81.     As of the most recent fiscal year, the Skillz platform has over 2.1 million monthly active users and hosts an average of over 1.5 million daily tournaments, including 780,000 paid entry daily tournaments, offering over $79 million in prizes each month.

82.     In the wake of Skillz's revolutionary advancements, mobile gaming has attracted billions of dollars of investment from traditional sports teams and leagues, professional athletes, pop stars, private equity, media moguls, Fortune 100 corporations, and a diverse array of game publishers.

83.     Skillz's rise has fueled the growth of an industry whose market size already eclipses music, movies, and television.

**B.     Skillz Connects Real Players In Head-To-Head Tournaments**

84.     The Skillz gaming application is available for free download on the Apple App Store and the Samsung Galaxy Store.

85.     Skillz does not primarily develop the games played on its platform itself—Skillz helps game developers enable social competition in their own games.

86.     The Skillz platform matches live users in head-to-head tournaments based on their relative skill levels such that players of the same skill level play against each other.

30

87. The Skillz platform also allows users to enter bracketed tournaments.

88. Players can choose from hundreds of games to play on the Skillz platform. Some of Skillz's most popular games include Solitaire Cube, 21 Blitz, Blackout Bingo, and Bubble Cube 2.

89. Skillz's model relies on the concept of player liquidity—which refers to the degree to which one player will find an opponent who wants to play a match.

90. The higher the player liquidity, the more likely that players will find an appropriate opponent quickly; the lower the player liquidity, the harder it is to find a match and the longer it takes to find a match.

91. This promise of fair and quick matchmaking matters tremendously to users, who want to play evenly matched contests without the risk of being steamrolled by an exponentially more experienced and skilled player—and be matched with competitors with little to no delay.

92. Skillz uses algorithms to match players based on ability level and game history to ensure that each tournament is fair. Most matching is done asynchronously. In asynchronous games, both players play the same match with the same conditions, but they do not have to play at the exact same time. The moves that one player makes do not affect the other player's game.

93. To compete in Skillz cash competitions, a user has to have a mobile device, be over the age of 18, and be located in an area of the world where cash gameplay is available.

94. Skillz does not use, operate, or enable computers or artificial competitors, i.e., "bots," to play and win its cash games.

95. Many of Skillz's games include a chat function, which enables users to chat live with their opponents.

31

96.     Skillz also provides its users with chat rooms that provide a forum for members of the Skillz community to communicate, answer questions and get to know their fellow players.

97.     Skillz enables players to access the user profile of their competitors and other users. A user profile may contain information about a player's history and skill level, their profile avatar,, and physical location.

**C.      Voodoo Capitalizes on Skillz's Success**

98.     Voodoo currently offers several mobile gaming applications, including Blitz Win Cash—all in which players can compete to win cash prizes. The Blitz Win Cash platform offers several games within its application.

99.     Voodoo's games are similar to versions offered on the Skillz platform—namely Solitaire Cube, 21 Blitz, Blackout Bingo, and Bubble Cube 2—and they directly compete for users with the analogues available on Skillz's platform.

100.    In 2022, Voodoo reportedly surpassed six billion downloads, gaining one billion downloads in nine months.[47]

101.    Voodoo's gaming applications are available for free download on the Apple App Store and the Google Play Store.

102.    By popularity, Blitz Win Cash is currently the #8 ranked application in Apple App Store's "Casino" category.

103.    Voodoo users live, and play Voodoo games, within this District.

104.    Because Skillz and Voodoo offer similar games and platforms, with both offering cash prizes, Skillz and Voodoo compete for the same users and the same prospective users.

---

[47] Ex. LL (PocketGamer.biz article).

105.     Furthermore, a typical user would not switch back and forth between Skillz and Voodoo. Both Skillz and Voodoo offer in-game rewards that players accumulate by reaching various accomplishments. The more one plays, the more in-game rewards the player can obtain. Likewise, the more one plays, the more one can "rank" up within the game, increasing the player's prestige and accolades within the game. As a result, an individual player would be motivated to choose and stick with one platform to focus his or her efforts to attain the most in-game rewards, accolades, and other accomplishments.

106.     As a result, Skillz and Voodoo are direct competitors in what can be described as a zero-sum game—in many cases, Voodoo's gain is Skillz's loss.

107.      As noted above, player liquidity is a crucial aspect of Skillz's and Voodoo's platforms. Players expect to be quickly matched against a competitor, and any delay in the matching could result in the player losing interest—and switching platforms, permanently. The more players that are active on the platform, the faster that players can be matched against each other, as there will be a wider pool of players with which to find similarly-skilled players to match up against.

108.     Skillz's games utilize a head-to-head matchup, where two players are matched up against each other, for a one to one matchup.

109.     Voodoo's games utilize head-to-head matchups, like Skillz, as well as multiplayer tournaments, where players compete against several other players. Some of these tournaments offer up to $500 in cash prizes.[48]

---

[48] Blitz – Win Cash, *Need extra MONEY ? Play Blitz Now!*, FACEBOOK, https://www.facebook.com/reel/908835760993240 (last visited June 28, 2024).

33

110. Because these tournaments involve more players, each of whom must submit an entry fee, the cash prizes are larger. The prospect of having a larger cash prize, but the same entry fee, is enticing to many users.

111. Indeed, Voodoo's cash prizes are funded by the entry fees of all the players in the game. That is, each player in the game pays an entry fee. Upon information and belief, Voodoo takes a cut of this cash for itself. Then, after taking its cut, Voodoo divides the remaining funds into cash prizes for other players.[49]

112. In part because of Voodoo's tournament-based games, which offer the chance at larger cash prizes, some users of Skillz have migrated over to Voodoo, and some prospective users who may have used Skillz now sign up instead with Voodoo.

113. Voodoo claims to match users into games based on relative skill level such that all the players in one game are the same skill level. However, while Skillz's head-to-head games require only two players, Voodoo's tournament-based games require multiple players to fill a game. Because all of the players in any given game must purportedly be at similar skill levels, a significantly larger pool of players must be active as games are being filled to find enough similarly-skilled players to populate the tournament.

114. Voodoo's games, therefore, require a higher player liquidity than Skillz's games. In that same vein, Voodoo's games are at a greater risk of failing to launch if player liquidity does not constantly remain high.

---

[49] *Blitz FAQ: How do I win cash?*, BLITZ – WIN CASH, available at https://blitzwincash.notion.site/How-do-I-win-cash-1d7d080de5b445fc9ddd0b99dfbca1f0 (last visited June 28, 2024).

115.    Voodoo matches players in tournaments faster than would be expected if users were matching with other live human players, indicating that Voodoo creates an artificially high player liquidity on its platform.

**D.     Voodoo Falsely Advertises That It Does Not Allow Bots, That Its Games Are Fair and Skill-Based, and That Its Users Compete Against Similar Players**

116.    Voodoo advertises to the public that all of its games are fair and skill-based. Voodoo also advertises that its users compete against other similarly-skilled players, and outright states that its competitors are all "real players"—not "bots." Voodoo also tells the public that it does not have a vested interest in who wins or loses, and that it does not profit on the outcome of its tournament. These advertisements are false.

117.    For instance, in the FAQ's on its website for Blitz Win Cash, Voodoo states: "Although our matchmaking algorithm tries its best to match opponents of the same level, it can happen that there are not enough players of a given level at a specific time. You will not get matched with an opponent right away in these cases."[50] This implies that a player will only be matched with other live humans.

118.    In addition, the Blitz Win Cash FAQs state that opponents are matched based on skill level, and that Voodoo's "team" does not interfere in creating matches:[51]

> **How does matchmaking work?**
>
> Our matchmaking system matches at best opponents of a similar level and who wish to play the same game simultaneously.

---

[50] *Blitz FAQ: What is a "pending" game?*, BLITZ – WIN CASH, available at https://blitzwincash.notion.site/What-is-a-pending-game-0d5f29a068814a6ea91e46096f697b26 (last visited June 28, 2024).

[51] *Blitz FAQ: How does matchmaking work?*, BLITZ – WIN CASH, available at https://blitzwincash.notion.site/How-does-matchmaking-work-87dd5fb1a1724a30a524c2ab88ce4510 (last visited June 28, 2024).

35

> Players competing in a match all have a fair chance of winning to guarantee a fun experience for everyone.
>
> The matchmaking algorithm improves in time at every game you play. The more you play, the more you will be matched with players with close skill levels.
>
> Our team will never interfere in any case with the matchmaking system, which is entirely automatic.

119.    On the Google Play Store, Blitz Win Cash advertises, "With no bots allowed, you'll play against real players worldwide in daily challenges, weekly contests, and multiplayer tournaments."[52]

120.    On its Apple App Store preview page, Voodoo's Blitz Win Cash also claims: "With no bots allowed, you'll play against real players worldwide in daily challenges, weekly contests, and multiplayer tournaments."[53]

121.    Voodoo's Blitz Win Cash Apple App Store preview page goes on to state that: "This is not just any gaming app, it's a fair, skill-based competition app."[54]

122.    Voodoo's publicly-available descriptions of Blitz Win Cash represent that games on the application are skill-based and played by "players."

123.     Voodoo's publicly-available descriptions of Blitz Win Cash represent that games on the application are "fair."

124.    Suspiciously, Voodoo (unlike Skillz) does not provide a function to chat with other players.

---

[52] *Blitz – Play GamesWin*, GOOGLE PLAY STORE, https://play.google.com/store/apps/details?id=app.wincash.blitz&hl=en_US&gl=US (last visited June 28, 2024).
[53] *Blitz - Win Cash*, APPLE APP STORE, https://apps.apple.com/us/app/blitz-win-cash/id1540981482 (last visited June 28, 2024).
[54] *Id.*

125.    Similarly, Voodoo players cannot access a competitor's gaming history, while Skillz players can.

126.    Voodoo has responded to negative user reviews—including those suggesting its games may be fixed through Voodoo's use of bots—by claiming users "always have a fair chance to win!"[55] Voodoo regularly denies and refutes customers' accusations that it deploys bots. Voodoo also responds to users who make no mention of bot use that Voodoo does not use bots.

127.    Pasted below are examples of actual customer reviews from Apple's App Store in which users express suspicion and frustration that Voodoo is using bots, along with Voodoo's publicly-available responses:[56]

128.    For example, user Rigged124 writes, "Rigged they use bots it's impossible to win."

| **Scam** | **10/07/2024** |
| | **Rigged124** |
| ★ ★ ★ ★ ★ | |

Rigged they use bots it's impossible to win.

| **Developer Response** | **10/11/2024** |

No bots are playing on Blitz. You are always matched with players of a similar level and experience on Blitz. This way, you always have a fair chance to win! If you want to check the fairness of the games, you always have a replay of your opponent's game provided after your match!

129.    Likewise, user KetchupKermit complains that opponents are "[n]ot even real people."

| **I hate this game** | **1 year ago** |
| | **KetchupKermit** |
| ★ ★ ★ ★ ★ | |

---

[55] *Blitz - Win Cash: Ratings and Reviews*, APPLE APP STORE, https://apps.apple.com/us/app/blitz-win-cash/id1540981482 (last visited June 28, 2024).

[56] *See* Ex. A (user reviews suspecting bot use). User reviews have been reproduced for readability in full in the Exhibits attached hereto.

Not even real people. You win a few games and then you lose even more. It's just an infinite cycle of gaining nothing. Don't waste your time.

**Developer Response**                                    **1 year ago**

Thank you for your feedback. We are sorry that your experience at Blitz didn't reach your expectations.

Please remember that no bots are operating on Blitz. You are always matched with real players and given a fair chance to win. Every match is providing a replay allowing you to check the fairness of your match.

130.    User KetchupKermit (directly above) complains that "[y]ou win a few games and then you lose even more. It's just an infinite cycle of gaining nothing." This potentially shows that Voodoo either deploys bots that allow users to win when they first start playing, or matches them with humans when they first start playing—only to find inconsistencies and suspect Voodoo is using bots later on.

131.    In response to user kunalme criticizing Blitz Win Cash as the "[w]orst app ever[,]" Voodoo responds, "No bots are operating on Blitz." Even though kunalme does not complain about bots, Voodoo, unprompted, disclaims bot use.

**Worst app ever don't**                                 **04/09/2024**
                                                              **kunalme**


Fraudulent Worst app ever dont play to loose all your money.

**Developer Response**                                    **10/03/2024**

No bots are operating on Blitz.

132.    Ironically, Voodoo's responses to its reviews might even be written by bots themselves. Notably, in response to users Rigged124 and KetchupKermit (above), Voodoo echoes three repeated points: (1) no bots are operating on Blitz Win Cash; (2) users are matched with real players; and (3) users are given a fair chance to win.

133.    Blitz Win Cash's Terms and Conditions do not inform users that Voodoo matches users against Voodoo's bots. Rather, Blitz Win Cash's Terms and Conditions state in part:

> Our games also provide You with the option to play against other people in Competitive Modes requiring You to pay an entry fee.[57]

134.    Blitz Win Cash's Rules state that "[t]he rewards granted to the different participants in a Match are calculated based on their ranking in the Match. Every entrant will be ranked based on the number of points scored during the game[,]" which represents that its games are skill-based and fair.[58]

135.    Blitz Win Cash's Rules further imply that the participants in these tournaments— referred to as "players" and "users"—are live human players. The Rules state that games are "constituted through asynchronous random matchmaking between players who have chosen to play the same game. Each user will be able to enter a given Match only once and subsequently cannot submit more than one score in a Match. If the number of required players is not met 24 hours after the last player entry into the Match, the Match will be canceled and all entry fees refunded to the players."[59] This language strongly suggests that all players are live humans.

136.    In a similar case that Skillz brought against a different competitor in the mobile cash gaming space, Papaya Gaming, Judge Cote recently denied Defendants' motion to dismiss, finding that Papaya Gaming's "references to 'players', 'individuals', 'winners', 'fair' and 'skill-

---

[57] Ex. F § 2.2; *see also Rules*, § 2.2(ii), BLITZ – WIN CASH, available at https://blitzwincash.notion.site/Blitz-Win-Cash-Rules-bf6705d221804934b569314c4eba370d (last visited June 28, 2024) ("All users participating in the Match will be presented with the exact same game, environment, and constraints. Only skill will allow a user to score better than their opponents and win a prize.").

[58] *Rules*, § 2.1(ii), BLITZ – WIN CASH, available at https://blitzwincash.notion.site/Blitz-Win-Cash-Rules-bf6705d221804934b569314c4eba370d (last visited June 28, 2024).

[59] *Id.* § 2.(i).

based'" may be "found by a jury to imply that Papaya's Gaming's competitions competition are conducted among human players only and not among humans and bots."[60]

### E.      Voodoo Deceives Consumers and Steals Market Share from Skillz By Using Bots

137.    Voodoo deploys bots—i.e., computer algorithms—to rig tournaments in its favor. Voodoo uses bots to simulate real players and to fix the outcome of matches. Because Voodoo controls the outcome of its matches, it controls exactly how much its human players lose—and how much of the entry fees Voodoo keeps.

138.    Indeed, Voodoo manipulates the outcome of its tournaments to place human players in certain spots (often, the second- or third-place spots) to make the outcomes of the tournaments seem believable, such that Voodoo takes as much of the players' entry fees as possible on an ongoing basis. What is more, Voodoo controls the *particular* spot a player earns (again, often second- or third-place spots) to induce them to keep playing by letting them win just enough.

139.    In fact, individual human players in five "player" Voodoo tournaments are often the *only* humans that play in those tournaments—with the other four competitors being Voodoo's bots. When Voodoo's bots place in the first-place spot (as is frequent), Voodoo's first place bot wins the highest prize of the tournament.

140.    At least one former Voodoo employee has confirmed Voodoo's use of bots in cash tournaments.

141.    On information and belief, Voodoo makes a profit on every tournament played by its users, and its fraudulently-earned revenues are well into the hundreds of millions of dollars.

142.    Voodoo's use of bots steals market share and revenue from Skillz.

---

[60] Ex. MM (*Skillz Platform Inc. v. Papaya Gaming, Ltd et al.*, No. 24 Civ. 1646, ECF No. 40, slip op. at 7–8 (S.D.N.Y. July 23, 2024) (Cote J.)).

143.    Voodoo's use of bots is at least partially driven by its lack of player liquidity. In order for real cash games to be launched on a platform successfully, the platform must have a sufficient level of player liquidity to match players at the same skill level. Legally compliant companies like Skillz must make substantial investments to acquire enough users to establish sufficient player liquidity. On the other hand, companies like Voodoo that use bots to simulate human players can artificially inflate their player liquidity—with little or no user acquisition costs—and increase the number of "competitors" that a player can be matched against.

144.    As a result of Voodoo's use of bots, Voodoo players are placed into games faster than they would otherwise be able to if the application relied solely on the presence of live human players, as does Skillz. Voodoo therefore saves substantial user acquisition costs for its games and platform by using bots, has fraudulently grown its market share in the real cash gaming industry (to Skillz's detriment), and is able to provide a multi-player product that a company like Skillz cannot replicate without also using bots—putting Skillz at a clear competitive disadvantage.

145.    The short amount of time it takes players to match into a game on Voodoo's gaming platform regardless of the time of day demonstrates Voodoo has a player base that would be impossible but for its use of bots.

146.    Additionally, when groups of new live players (who are all at the same skill level) try to match into the same tournament at the same time, they rarely, if ever, match into the same tournament and face each other. This means that player liquidity on Blitz Win Cash is impossibly high and indicates that Voodoo is manipulating matches such that users are not playing other live players. Furthermore, the same "players" appear to enter multiple matches that start and conclude at nearly the same time. Again, this indicates that Voodoo manipulates game play.

147. In fact, in Apple App Store reviews and on social media, a number of Voodoo users have expressed suspicion—and dismay—that Voodoo may be using bots instead of live players on their gaming applications.

148. Voodoo users have also made clear that Voodoo's representations of fairness induced them to use Voodoo's gaming applications.[61] For example, user Robbed21 writes, "I believed and trusted it was a legitimate and fair site." User hdhbdhjjr complains "[t]he game claims to be a fair skills based completion with other players but that is a lie."[62]

| **Victim** | **05/21/2024** |
|---|---|
| | **Robbed21** |

★ ★ ★ ★ ★

Ughhh I believed and trusted it was a legitimate and fair site, but have been taken for my money. I hope they credit it back like they should after trying to call numerous times and complain.

| **Developer Response** | **05/23/2024** |
|---|---|

Blitz Support isn't available by phone. Could you please contact us at Support by email regarding this issue? We will do our best to resolve it as fast as possible!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| **Fraud and lies** | **1 year ago** |
|---|---|
| | **hdhbdhjjr** |

★ ★ ★ ★ ★

The game claims to be a fair skills based completion with other players but that is a lie. You don't get paired against people in real time. You play a game and then once Blitz knows your score they decide who to pair you with. Some games are paired in minutes and some games are paired hours later... most likely against someone else who they also know the score of their game against. So everything they say is a flat out lie. Deciding who to pair you up against after they know your score is fraud and theft! Its not a 'fair skill based competition' when the computer gets to pair people up after they know the score of both players!

---

[61] *Blitz - Win Cash: Ratings and Reviews*, APPLE APP STORE, https://apps.apple.com/us/app/blitz-win-cash/id1540981482 (last visited Apr. 28, 2024).

[62] *See* Ex. B (user reviews regarding representations of "fairness").

Update. Their response is that 'your score isn't used to find an opponent'. If thats the case then all games should clear in the order that they were played regardless of score. By their own admission this clearly doesn't happen. If you post a high score they delay matching it in order to control the outcome. This is fraud and you should give me my money back!

**Developer Response**                                              **1 year ago**

Update: you will notice that in 1v1 about half of the time you get matched instantly and get the name of the opponent BEFORE you play (so we dont wait to know your score to match you). That is in a case where there is already an opponent available. In the case where there is no pending match to pair you with, we let you play right away so we don't keed you waiting for several minutes (which would be annoying). And as soon as an opponent arrives, we pair him with you (before we know his score) and give him the exact same game. We have no way to know both players score before we match them and matchmaking only takes into account winning history.

Thank you for your feedback. We are sorry that your experience at Blitz didn't reach your expectations.

When you are playing on Blitz, our matchmaking system will find a player of a similar skill level and a similar experience to guarantee fair chances to win for both players. This is why you aren't always playing against another player at the same time.

Your score isn't used to find you an opponent. Your past results and your experience on Blitz are used on the matchmaking system to find you the best opponent possible, giving your [sic] a fair chance of winning.

If you have any issues with our app, please don't hesitate to reach us at Support.

149.    Voodoo users have also indicated that Voodoo's representations its games are skill-based induced them to play Voodoo's games.[63] For example, user Omjordan writes, "They tell you your winning is based on skill but it's not so just don't waste your time." Omjordan suggests that, instead of playing Blitz Win Cash, "just go ahead and go to a casino" or "just go buy you a lottery ticket[.]" User avij32 writes, "Much like an online casino, they control in outcome and how

---

[63] *Blitz - Win Cash: Ratings and Reviews*, APPLE APP STORE, https://apps.apple.com/us/app/blitz-win-cash/id1540981482 (last visited June 28, 2024).

successful you are in a game." User avij32 continues, warning that Blitz Win Cash is "NOT skill based. It is luck based."[64] These reviews allude to Voodoo using algorithms to manipulate match outcomes.

**Scam**                                                                   **1 year ago**
                                                                           **Omjordan**
★ ★ ★ ★ ★

Do yourself a favor and don't waste time or money on this app just go ahead and go to a casino at least they offer free play and free food or rewards you can use for both or just go buy you a lottery ticket your odds of winning are still better than this game.

They tell you your winning is based on skill but it's not so just don't waste your time.

**Developer Response**                                                     **1 year ago**

Thank you for your feedback. We are sorry that your experience at Blitz didn't reach your expectations.

However, all our games are based on skills only, and you can easily review them by watching the Replays for each match played!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Scammers**                                                               **1 year ago**
                                                                           **avij32**
★ ★ ★ ★ ★

Don't play this have even if you're really good. Much like an online casino, they control in outcome and how successful you are in a game. Like on bingo, you can get a whole board covered on a low payout game, but then you go to a higher paying game and all of a sudden, you get 12 numbers in a row that aren't on your board and it ruins the whole game. There is absolutely nothing you can do about it. I just lost a bunch of money because of this. So trust me, do not play this game. It is NOT skill based. It is luck based.

**Developer Response**                                                     **2 years ago**

Hello, please drop your username here so we can investigate and refund.

---

[64] *See* Ex. C (user reviews regarding representations that Voodoo's games are "skill-based").

> For context, if there is no opponent, the game should expire after 24 hours and the entry fee refunded to your balance.

150. Voodoo users have further indicated that Voodoo's representations of "players" and its implications that these players were live humans (and not bots) induced them to use Voodoo's gaming applications.[65] User eddiemc3272 complains, "They say your playing other people w[h]ich is a lie other wise they would let us chat like every other game."[66]

**Scam**                                                    **10/29/2024**
                                                            **eddiemc3272**

★ ★ ★ ★ ★

Just like every other game it's a scam. They say your playing other people wich is a lie other wise they would let us chat like every other game. They take your money and the "players" come take it.

It's a fixed game but they sure make you think you have a chance.

**Developer Response**                                       **11/03/2024**

You are always matched with players of a similar level and experience on Blitz. This way, you always have a fair chance to win!

We don't have a chat feature between players to avoid abuse in our community.

151. Player reviews show that Voodoo players play Voodoo's games with the assumption and expectation that they are playing live humans, not bots.

152. Player reviews also show that Voodoo players have lost money playing games on the platform. For example, user Robbed21 (above) complained of "hav[ing] been taken for my money."

153. Voodoo has apparently recognized the negative impact to user experience that comes with bot use, as it *explicitly prohibits the use of bots* in its Rules:

---

[65] *Blitz - Win Cash: Ratings and Reviews*, APPLE APP STORE, https://apps.apple.com/us/app/blitz-win-cash/id1540981482 (last visited June 28, 2024).
[66] *See* Ex. D (user reviews regarding representations players are real).

45

> **Use of any automated system (e.g., robots, automatic, macro, programmed, or like entry methods) is prohibited.** Any attempt by any entrant to use an automated system or to obtain more than one (1) entry by using multiple telephone numbers, devices, identities, or any other methods, will void all of that entrant's entries, and render that person ineligible to receive any of the prizes. Entry materials/data that have been tampered with or altered are void. Blitz - Win Cash reserves the right to disqualify any user if it determines, at its sole discretion, that any user information has been changed or falsified in order to meet eligibility requirements.[67]

**F.      By Virtue of Its Use of Bots, Voodoo is At Minimum, Operating a Gambling Platform, In Contravention of New York Law**

154.    Since 1894, Article I, Section 9 of the New York State Constitution has expressly prohibited gambling, apart for a few limited, irrelevant exceptions, and the New York Penal Law has long recognized crimes for promoting gambling and for maintaining gambling devices and records.

155.    Under New York law, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Crim. Law § 225.00(2). Furthermore, a "contest of chance" is defined as "any contest, game, gaming scheme or gaming device in which the outcome ***depends in a material degree upon an element of chance, notwithstanding that skill*** of the contestants may also be a factor therein." N.Y. Crim. Law § 225.00(1) (emphasis added).

156.    Because Voodoo users play to win money, and because Voodoo uses bots to manipulate match outcomes, Voodoo's gaming platform meets this definition of gambling. For example, bots that mimic players introduce a level of randomness—an element of chance—even if they have some predetermined skill programming. No matter how skilled a player becomes, that

---

[67] *Rules*, § 4, BLITZ – WIN CASH, available at https://blitzwincash.notion.site/Blitz-Win-Cash-Rules-bf6705d221804934b569314c4eba370d (last visited June 28, 2024) (emphasis added).

player's outcome turns on Voodoo's algorithms rather than the player's skill. Similarly, a bot that fixes game scores would prevent a player from winning based on skill alone. In other words, any element of skill in Voodoo's games is reduced in comparison with the randomness infused into the process by the use of bots. As a result, and at a minimum, Voodoo users are less likely to influence the outcome of a game by virtue of their relative skill level.

157.    For Voodoo's games to *not* be considered illegal gambling, its games must be significantly more based on skill than chance. Indeed, skill must predominate and be overwhelmingly more influential than chance in deciding the winners of its games. But because Voodoo uses bots, Voodoo's games are not games of skill.

158.    In fact, Voodoo's practices are *more* pernicious than mere illegal gambling, as Voodoo, through its use of bots, is able to control when players win or lose—and when Voodoo keeps the entry fees and prizes. Recognizing that New York's Penal Code and similar laws in other jurisdictions are directly contrary to Voodoo's model, Voodoo markets itself as a skill-based platform, although it is anything but.

### FIRST CAUSE OF ACTION
### (False Advertising Under the Lanham Act (41 U.S.C. § 1125(a)(1)))

159.    Skillz re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

160.    On websites and application interfaces directed towards consumers, Voodoo represents that its gaming applications are "fair."

161.    Voodoo also represents that its games are skill-based.

162.    Voodoo promises its users that "no bots are playing" on its applications.

47

163.     Voodoo advertises that users of its applications will be matched with "players" and "individuals," while its player base includes fake scores that it creates and deploys through its use of computer algorithms or bots.

164.     Voodoo also implies to users that Voodoo has no vested interest in who wins or loses. Blitz Win Cash's Terms and Conditions state that "some employees may be allowed to hold a public playing Account or to compete against public players *only for testing purposes* intended to improve Our Services experience. In such a case, the public player competing against an employee will be credited back and *the employee will not receive any benefit* from the Account."

165.     Based on these representations of fairness, skilled-based play, live opponents, and Voodoo's not having a financial interest in the outcomes of its matches, Voodoo users pay fees to enter gaming matches and tournaments hosted on Voodoo platforms, and act reasonably in doing so.

166.     These representations regarding fairness, skilled-based play, live opponents, and Voodoo's not having an interest in the financial outcome of its matches and tournaments are literally false.

167.     Voodoo's representations are false and misleading because Voodoo controls the outcome of the matches and whether its real players win or lose.

168.     Because Voodoo deploys bots in its games and controls the outcome of its games, Voodoo's games are not skill-based, but are instead dependent on the parameters and algorithms created by Voodoo.

169.     Because Voodoo deploys bots in its games and controls the outcomes of its games, Voodoo's games are not fair.

48

170. Voodoo has a vested interest in the outcome of matches and tournaments because it controls whether players win or lose.

171. On information and belief, Voodoo is required to certify to financial institutions that process its customers' payments for its games, as well as third parties including the Apple App Store, that Voodoo does *not* have a vested financial interest in the outcome of Voodoo's tournaments in order to legally access those institutions' services and platforms. Indeed, the fact that Voodoo's games are available on the Apple App Store—and that Voodoo players' funds are processed by U.S. financial institutions—means Voodoo *must* be making material misrepresentations to those third parties. A federal court in the Northern District of California has already ruled that statements made by AviaGames, Inc., another mobile gaming company that also uses bots, that it did not keep money or prizes associated with its games were fraudulent.

172. In the alternative, Voodoo's representations of fairness, skilled-based play, live opponents, and not having a financial interest in the outcome of its games are literally false by implication, as Voodoo's representations (at the very least) imply that the outcomes of the games are determined exclusively by the skill level of live humans.

173. Further, Voodoo's representations of fairness, skilled-based play, live opponents, and not having a financial interest in the outcome of its tournaments are literally false by omission, as Voodoo does not inform the users that the outcome of its games are determined by Voodoo's algorithms.

174. For the same reasons, Voodoo's representations of fairness, skilled-based play, live opponents, and not having a financial interest in the outcome of its games are materially misleading.

175. *Even if* Voodoo's use of algorithms to control the outcome of its games did not render its games unfair or games of chance, Voodoo would still be deceiving consumers because they believe Voodoo's games are played by live individuals, as opposed to bots, and that Voodoo does not have a vested financial interest in the outcome of its games.

176. Voodoo's representations have deceived users of Voodoo's games.

177. By making these false representations to consumers, including within advertisements, on its website, within its game applications, and in response to user reviews, Voodoo has diverted at least Skillz's player base, thereby harming Skillz, including by way of lost revenue, market share, and profits in an amount to be proven at trial.

178. For companies like Voodoo that offer large, multi-player tournaments, a significantly larger pool of players of the game must be active as the tournaments are being filled to find enough similarly skilled players to populate the tournament compared to head-to-head competitions. By using fake players or bots to enter mobile gaming competitions, a company artificially increases its player liquidity and thereby the number of "competitors" that a player can be matched against, resulting in a relatively short amount of time—or no wait at all—for players to enter and complete a head-to-head competition or multiplayer tournament. Quick matching and large format tournaments enabled by bots draws users to a platform, allowing the company using bots to grow its user base while minimizing user acquisition costs—creating a level of player liquidity that legally compliant companies like Skillz (who must make substantial investments to acquire users) simply cannot compete with.

179. Players who do not know that they are playing against bots in tournaments are drawn to bot-enabled games because of fast matching and multi-player tournaments and away from games hosted on Skillz's platform who cannot match the player liquidity that can be

artificially achieved through the use of bots. Indeed, Skillz consistently receives feedback from players who desire to play in large format tournaments on the Skillz platform, but in the absence of bots, this is not possible.

180. These players who desire to compete in large-format tournaments are therefore drawn to Voodoo's games and away from the games hosted on Skillz's platform.

181. In the first six months of 2021, before the launch of Voodoo's Blitz Win Cash, the top two games on Skillz ranked (on average) at number 2 and number 11, respectively, in the Casino category on the Apple App Store. By December 2022, when Blitz Win Cash had been downloaded an estimated 1.5 million times, the rankings for the same Skillz games had dropped to (on average) number 22 and number 90, respectively, while Blitz Win Cash ranked (on average) number 8 in the Casino category.

182. Downloads of Skillz's games decreased significantly as players who were previously entering competitions on Skillz's platform and new entrants into the marketplace who would have played Skillz's games flocked to Voodoo's games.

183. In 2021, the year that Voodoo launched Blitz Win Cash, Skillz generated approximately $380 million of revenue. When Voodoo scaled their product in 2022, increasing downloads by an estimated 10 times according to Sensor Tower, Skillz's revenue decreased by approximately $90 million to an annual total of $270 million (a 29% decline). In 2023, Voodoo increased its promotion for Blitz Win Cash, increasing estimated downloads of the application by over 40% versus 2022 and by over 1300% versus 2021 totals. Coinciding with the increased scale of Blitz Win Cash, Skillz's revenue decreased in 2023 by approximately $120 million versus 2022 revenue (a 45% year-over-year decline and a 60% cumulative decline versus 2021).

184.    In the first half of 2024, Voodoo has continued to scale Blitz Win Cash, driving almost 850,000 new downloads of the application according to Sensor Tower. Coinciding with Voodoo's increased scale, Skillz's revenue decreased approximately 40% year-over-year for the first six months of 2024.

## SECOND CAUSE OF ACTION
### (Violations of New York General Business Law (GBL) § 349)

185.    Skillz re-alleges and incorporates the allegations in each of the paragraphs in this Complaint as if fully set forth herein.

186.    On websites and application interfaces directed towards consumers, Voodoo represents that its gaming applications are "fair."

187.    Voodoo also represents that its games are skill-based.

188.    Voodoo advertises that users of its applications will be matched with "players" and "individuals."

189.    Voodoo deploys bots or algorithms which control the outcome of the matches and whether its real players win or lose (or, in the case of tournaments, their spot on the leaderboard).

190.    Voodoo also implies to users that Voodoo has no vested interest in who wins or loses. Blitz Win Cash's Terms and Conditions state that "some employees may be allowed to hold a public playing Account or to compete against public players *only for testing purposes* intended to improve Our Services experience. In such a case, the public player competing against an employee will be credited back and *the employee will not receive any benefit* from the Account."

191.    Based on Voodoo's representations of fairness, skilled-based play, live opponents, and not having a financial interest in the outcome of its tournaments, Voodoo users pay fees to enter gaming tournaments hosted on Voodoo platforms, and act reasonably in doing so.

52

192. Voodoo's representations are false and misleading because Voodoo deploys algorithms in its gaming platforms that control the outcome of its matches.

193. Because Voodoo deploys bots in its games that influence the ultimate score, Voodoo's games are not skill-based.

194. Because Voodoo deploys bots in its games, Voodoo's games are not fair because they are rigged.

195. Because Voodoo keeps a user's full entry fee when Voodoo's bots win and the player loses, Voodoo has a vested interest in the outcome of its games. When a Voodoo bot or fake score wins a prize—generated from entry fees paid by human players—Voodoo keeps that prize money.

196. In making these representations, Voodoo advertises itself as hosting matches and tournaments comprised of live players.

197. Based on these representations of fairness, skilled-based play, live opponents, and not having a financial interest in the outcome of its games, Voodoo users pay fees to enter gaming matches and tournaments hosted on Voodoo platforms, and act reasonably in doing so.

198. These representations are false because Voodoo uses bots in its gaming platforms, and Voodoo keeps a user's entry fee when these bots rig the match in favor of Voodoo.

199. These representations have deceived consumers of Voodoo's gaming applications.

200. Voodoo's use of bots further harms the public because it transforms its games into—at a minimum—illegal gambling.

201. Voodoo's representations entice the public into participating in illegal gambling, unwittingly.

202.   In fact, Voodoo's practices are *more* pernicious than mere illegal gambling because Voodoo is able to control when players win or lose and Voodoo keeps the entry fees and prizes.

203.   Because Voodoo operates an illegal gambling platform, it is in violation of New York's Penal Law. As a result, the harm Voodoo causes consumers is above and beyond the general consumer confusion that is present in a standard case of false advertising.

204.   By falsely holding itself out to the public, Voodoo diverted Skillz's player base, thereby harming Skillz, including by way of lost revenue, market share, and profits in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor as follows:

A.   For temporary, preliminary and permanent injunctive relief prohibiting Voodoo, its agents, or anyone working for, in concert with or on behalf of Voodoo from engaging in false or misleading advertising with respect to its gaming applications and/or violating the Lanham Act, 41 U.S.C. § 1125(a)(1), which relief includes but is not limited to removal of all false or misleading advertisements and corrective advertising to remedy the effect of Voodoo's false advertising;

B.   For an order requiring Voodoo to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of its gaming applications, including without limitation, the placement of corrective advertising and providing written notice to the public;

C.   Awarding Skillz actual, compensatory, and consequential damages;

D.   Awarding Skillz punitive damages;

E.   Awarding Skillz lost revenues;

F.     Awarding Skillz the revenues and any profits obtained by Voodoo as a consequence of Voodoo's wrongful conduct;

G.     Enjoining Voodoo from continuing its unlawful conduct, including but not limited to, using bots in its games and enjoining Voodoo from advertising its gaming applications as fair, skill-based, and involving human players;

H.     Costs and expenses in this action;

I.      An award of prejudgment and post-judgment interest; and

J.      Such other and further relief as the Court may deem just and proper.

## V.    **DEMAND FOR JURY TRIAL**

Skillz hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: October 2, 2024

KING & SPALDING LLP

By: */s/ Craig Carpenito*

Craig Carpenito
Jessica Benvenisty
Alvina Pillai
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036-2601
Tel: (212) 556-2100
Fax: (212) 556-2222

Lazar P. Raynal (*pro hac vice*)
Michael A. Lombardo (*pro hac vice*)
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 995-6333
Fax: (312) 995-6330

*Attorneys for Skillz Platform, Inc.*

56

# EXIHIBIT 2

# FEDERAL RULES

## OF

# CIVIL PROCEDURE

————

DECEMBER 1, 2024



Printed for the use

of

## THE COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

47            FEDERAL RULES OF CIVIL PROCEDURE            **Rule 28**

(3) *Order and Examination.* If satisfied that perpetuating the testimony may prevent a failure or delay of justice, the court must issue an order that designates or describes the persons whose depositions may be taken, specifies the subject matter of the examinations, and states whether the depositions will be taken orally or by written interrogatories. The depositions may then be taken under these rules, and the court may issue orders like those authorized by Rules 34 and 35. A reference in these rules to the court where an action is pending means, for purposes of this rule, the court where the petition for the deposition was filed.

(4) *Using the Deposition.* A deposition to perpetuate testimony may be used under Rule 32(a) in any later-filed district-court action involving the same subject matter if the deposition either was taken under these rules or, although not so taken, would be admissible in evidence in the courts of the state where it was taken.

(b) PENDING APPEAL.

(1) *In General.* The court where a judgment has been rendered may, if an appeal has been taken or may still be taken, permit a party to depose witnesses to perpetuate their testimony for use in the event of further proceedings in that court.

(2) *Motion.* The party who wants to perpetuate testimony may move for leave to take the depositions, on the same notice and service as if the action were pending in the district court. The motion must show:

(A) the name, address, and expected substance of the testimony of each deponent; and

(B) the reasons for perpetuating the testimony.

(3) *Court Order.* If the court finds that perpetuating the testimony may prevent a failure or delay of justice, the court may permit the depositions to be taken and may issue orders like those authorized by Rules 34 and 35. The depositions may be taken and used as any other deposition taken in a pending district-court action.

(c) PERPETUATION BY AN ACTION. This rule does not limit a court's power to entertain an action to perpetuate testimony.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Mar. 1, 1971, eff. July 1, 1971; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 25, 2005, eff. Dec. 1, 2005; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

### Rule 28. Persons Before Whom Depositions May Be Taken

(a) WITHIN THE UNITED STATES.

(1) *In General.* Within the United States or a territory or insular possession subject to United States jurisdiction, a deposition must be taken before:

(A) an officer authorized to administer oaths either by federal law or by the law in the place of examination; or

(B) a person appointed by the court where the action is pending to administer oaths and take testimony.

(2) *Definition of ''Officer.''* The term ''officer'' in Rules 30, 31, and 32 includes a person appointed by the court under this rule or designated by the parties under Rule 29(a).

(b) IN A FOREIGN COUNTRY.

(1) *In General.* A deposition may be taken in a foreign country:

(A) under an applicable treaty or convention;

(B) under a letter of request, whether or not captioned a ''letter rogatory'';

(C) on notice, before a person authorized to administer oaths either by federal law or by the law in the place of examination; or

(D) before a person commissioned by the court to administer any necessary oath and take testimony.

(2) *Issuing a Letter of Request or a Commission.* A letter of request, a commission, or both may be issued:

(A) on appropriate terms after an application and notice of it; and

(B) without a showing that taking the deposition in another manner is impracticable or inconvenient.

(3) *Form of a Request, Notice, or Commission.* When a letter of request or any other device is used according to a treaty or convention, it must be captioned in the form prescribed by that treaty or convention. A letter of request may be addressed ''To the Appropriate Authority in [name of country].'' A deposition notice or a commission must designate by name or descriptive title the person before whom the deposition is to be taken.

(4) *Letter of Request—Admitting Evidence.* Evidence obtained in response to a letter of request need not be excluded merely because it is not a verbatim transcript, because the testimony was not taken under oath, or because of any similar departure from the requirements for depositions taken within the United States.

(c) DISQUALIFICATION. A deposition must not be taken before a person who is any party's relative, employee, or attorney; who is related to or employed by any party's attorney; or who is financially interested in the action.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Apr. 29, 1980, eff. Aug. 1, 1980; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 1, 2007, eff. Dec. 1, 2007.)

### Rule 29. Stipulations About Discovery Procedure

Unless the court orders otherwise, the parties may stipulate that:

(a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition; and

(b) other procedures governing or limiting discovery be modified—but a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial.

(As amended Mar. 30, 1970, eff. July 1, 1970; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)

49             FEDERAL RULES OF CIVIL PROCEDURE             **Rule 30**

**Rule 30. Depositions by Oral Examination**

(a) WHEN A DEPOSITION MAY BE TAKEN.

(1) *Without Leave.* A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). The deponent's attendance may be compelled by subpoena under Rule 45.

(2) *With Leave.* A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):

(A) if the parties have not stipulated to the deposition and:

(i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants;

(ii) the deponent has already been deposed in the case; or

(iii) the party seeks to take the deposition before the time specified in Rule 26(d), unless the party certifies in the notice, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country after that time; or

(B) if the deponent is confined in prison.

(b) NOTICE OF THE DEPOSITION; OTHER FORMAL REQUIREMENTS.

(1) *Notice in General.* A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address. If the name is unknown, the notice must provide a general description sufficient to identify the person or the particular class or group to which the person belongs.

(2) *Producing Documents.* If a subpoena duces tecum is to be served on the deponent, the materials designated for production, as set out in the subpoena, must be listed in the notice or in an attachment. The notice to a party deponent may be accompanied by a request under Rule 34 to produce documents and tangible things at the deposition.

(3) *Method of Recording.*

(A) *Method Stated in the Notice.* The party who notices the deposition must state in the notice the method for recording the testimony. Unless the court orders otherwise, testimony may be recorded by audio, audiovisual, or stenographic means. The noticing party bears the recording costs. Any party may arrange to transcribe a deposition.

(B) *Additional Method.* With prior notice to the deponent and other parties, any party may designate another method for recording the testimony in addition to that specified in the original notice. That party bears the expense of the additional record or transcript unless the court orders otherwise.

(4) *By Remote Means.* The parties may stipulate—or the court may on motion order—that a deposition be taken by telephone or other remote means. For the purpose of this rule and Rules

28(a), 37(a)(2), and 37(b)(1), the deposition takes place where the deponent answers the questions.

(5) *Officer's Duties.*

(A) *Before the Deposition.* Unless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28. The officer must begin the deposition with an on-the-record statement that includes:

(i) the officer's name and business address;

(ii) the date, time, and place of the deposition;

(iii) the deponent's name;

(iv) the officer's administration of the oath or affirmation to the deponent; and

(v) the identity of all persons present.

(B) *Conducting the Deposition; Avoiding Distortion.* If the deposition is recorded nonstenographically, the officer must repeat the items in Rule 30(b)(5)(A)(i)–(iii) at the beginning of each unit of the recording medium. The deponent's and attorneys' appearance or demeanor must not be distorted through recording techniques.

(C) *After the Deposition.* At the end of a deposition, the officer must state on the record that the deposition is complete and must set out any stipulations made by the attorneys about custody of the transcript or recording and of the exhibits, or about any other pertinent matters.

(6) *Notice or Subpoena Directed to an Organization.* In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination. A subpoena must advise a nonparty organization of its duty to confer with the serving party and to designate each person who will testify. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

(c) EXAMINATION AND CROSS-EXAMINATION; RECORD OF THE EXAMINATION; OBJECTIONS; WRITTEN QUESTIONS.

(1) *Examination and Cross-Examination.* The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. After putting the deponent under oath or affirmation, the officer must record the testimony by the method designated under Rule 30(b)(3)(A). The testimony must be recorded by the officer personally or by a person acting in the presence and under the direction of the officer.

(2) *Objections.* An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to

any other aspect of the deposition—must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

(3) *Participating Through Written Questions.* Instead of participating in the oral examination, a party may serve written questions in a sealed envelope on the party noticing the deposition, who must deliver them to the officer. The officer must ask the deponent those questions and record the answers verbatim.

(d) DURATION; SANCTION; MOTION TO TERMINATE OR LIMIT.

(1) *Duration.* Unless otherwise stipulated or ordered by the court, a deposition is limited to one day of 7 hours. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination.

(2) *Sanction.* The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent.

(3) *Motion to Terminate or Limit.*

(A) *Grounds.* At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. The motion may be filed in the court where the action is pending or the deposition is being taken. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order.

(B) *Order.* The court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c). If terminated, the deposition may be resumed only by order of the court where the action is pending.

(C) *Award of Expenses.* Rule 37(a)(5) applies to the award of expenses.

(e) REVIEW BY THE WITNESS; CHANGES.

(1) *Review; Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) *Changes Indicated in the Officer's Certificate.* The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

(f) CERTIFICATION AND DELIVERY; EXHIBITS; COPIES OF THE TRANSCRIPT OR RECORDING; FILING.